UNITED STATES of America, Appellee,

v.

Steven Linwood ROBINSON, Appellant.

No. 75–3727.

United States Court of Appeals, Ninth Circuit.

June 16, 1976.

Rehearing and Rehearing En Banc Denied Oct. 26, 1976.

David M. Ochoa, Asst. Federal Public Defender (argued), Phoenix, Ariz., for appellant.

Ron Jennings, Asst. U. S. Atty. (argued), Phoenix, Ariz., for appellees.

OPINION

Before HUFSTEDLER and CHOY, Circuit Judges, and SMITH,* District Judge.

* Honorable Russell E. Smith, United States District Judge, District of Montana, sitting by designation.

HUFSTEDLER, Circuit Judge:

This appeal presents the question: Can founded suspicion, unlike probable cause, be based solely on the receipt by the stopping officer of a radio dispatch to stop the described vehicle, without any proof of the factual foundation for the relayed message? We hold that it cannot.

Robinson appeals from his conviction for interstate transportation of a stolen motor vehicle in violation of 18 U.S.C. § 2312. The district court denied his motion to suppress evidence obtained after the vehicle that Robinson was driving was stopped by Officer Holland, a state police officer. Robinson claimed that the evidence was the fruit of a stop that was not justified by founded suspicion and thus was obtained in violation of the Fourth Amendment.

On the evening of September 25, 1975, Officer Holland received a radio message from the Kingman, Arizona police dispatcher advising him to be on the lookout for a possible stolen 1976 Oldsmobile Cutlass, Nevada license CKC 434. Officer Holland testified that at the time he received the message, he believed that the dispatcher had obtained some information from an inspector at the Agricultural Inspection Station located at the Nevada-Arizona border. The Government did not call either the dispatcher or the inspector to testify. Officer Holland knew nothing more about the information upon which the dispatcher relied, and he knew none of the facts upon which the inspector relied to transmit the message. Based solely on the dispatcher's report, and not upon any observations of his own to justify the stop, Officer Holland saw the described vehicle and stopped it. Robinson was unable to produce his driver's license or the vehicle registration. A search of the automobile followed, during the course of which a bill of lading was discovered showing that the automobile had been shipped to a dealer in Las Vegas. The speedometer registered the exact mileage between Las Vegas, Nevada, and Kingman, Arizona. Officer Holland arrested Robinson for driving without a license. While Robinson was in custody, after effectively waiving his *Miranda* rights, he confessed the theft and the interstate transportation of the automobile. Robinson moved to suppress all of the evidence obtained after the stop as fruit of the illegal stop. Because we agree that the stop was illegal, the evidence should have been suppressed.

As the Supreme Court stated in *United States v. Brignoni-Ponce* (1975) 422 U.S. 873, 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 486:

> "The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest. *Davis v. Mississippi*, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969); *Terry v. Ohio*, 392 U.S. 1, 16–19, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 899 (1968)."

■ The stop violated the Fourth Amendment unless specific articulable facts, taken together with rational inferences from those facts, reasonably warranted a founded suspicion that Robinson was engaged in criminal activity. (*E. g., Terry v. Ohio, supra,* 392 U.S. at 21, 88 S.Ct. 1868; *United States v. Mallides* (9th Cir. 1973) 473 F.2d 859, 861.)

■ Officer Holland had no personal knowledge of any facts upon which to found suspicion. The foundation, if any, had to be supplied by the person whose observations and information generated the suspicion. The dispatch to Officer Holland, standing alone, does not prove the existence of founded suspicion. A facially valid direction from one officer to another to stop a person or a vehicle insulates the complying officer from assuming personal responsibility or liability for his act done in obedience to the direction. But the direction does not itself supply legal cause for the detention, any more than the fact of detention supplies its own justification.

We recognize that effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and that officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information. The fact that an

officer does not have to have personal knowledge of the evidence supplying good cause for a stop before he can obey a direction to detain a person or a vehicle does not mean that the Government need not produce evidence at trial showing good cause to legitimate the detention when the legality of the stop is challenged. If the dispatcher himself had had founded suspicion, or if he had relied on information from a reliable informant who supplied him with adequate facts to establish founded suspicion, the dispatcher could properly have delegated the stopping function to Officer Holland. But if the dispatcher did not have such cause, he could not create justification simply by relaying a direction to a fellow officer to make the stop.

The Government's argument that effective law enforcement requires us to validate stops made in response to calls from fellow law enforcement officers, without any proof at trial that a factual foundation existed to support the call, was made and firmly rejected in *Whiteley v. Warden* (1970) 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306. *Whiteley* involved probable cause, rather than founded suspicion, but we perceive no substantive difference between the two doctrines that would warrant a different result.

Reversed.

SMITH, District Judge (dissenting).

This case involves the right to stop and nothing more—if the stop was valid, the arrest was valid, and the search, a lawful incident of it, was valid.

I think that the rule should be that a police officer possessed of information given by a police dispatcher is entitled to stop on the basis of that information in the absence of evidence that the stopping officer did not act in good faith or that the whole of what was done was done for the purpose of avoiding the requirements of the fourth amendment. I take it that the majority does not quarrel with this rule.[1]

I do not believe that the act of a stopping officer which was reasonably done by him when done should be held to be tainted by later revelations that his informants were themselves inadequately informed. In short, in a stop case I would judge the conduct of the stopping officer and no more.[2]

The Constitution does not mandate the exclusion of illegally obtained evidence. In *Wolf v. Colorado,* 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), Mr. Justice Frankfurter said at 28, 69 S.Ct. at 1361:

> In *Weeks v. United States,* supra [232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914)], this Court held that in a federal prosecution the Fourth Amendment barred the use of evidence secured through an illegal search and seizure. This ruling was made for the first time in 1914. It was not derived from the explicit requirements of the Fourth Amendment; it was not based on legislation expressing Congressional policy in the en-

---

1. Thus, the majority says:
   ". . . A facially valid direction from one officer to another to stop a person or a vehicle insulates the complying officer from assuming personal responsibility or liability for his act done in obedience to the direction . . . ..
   "We recognize that effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and that officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information . . . .."

2. *See Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). Would the police

officer have been less justified than he was had it been revealed after the stop that the usually reliable informant was motivated by a desire for revenge and was lying? In any event, the stop in that case was based solely on the tip. The Government was not required to prove that the informant had a founded suspicion.

The evidence here, as I see it, while not conclusive, tends to support the proposition that the port of entry agent's suspicion was founded. The car, brand new, bore but one bug-covered license plate. That plate was on the rear where bugs would not normally splatter. The car did not have the license card used on new cars in Nevada. An officer stopping the car at an agricultural inspection station certainly could notice these things.

forcement of the Constitution. The decision was a matter of judicial implication. Since then it has been frequently applied and we stoutly adhere to it.[3]

As I understand it, the exclusionary rule was designed as a prophylactic rule—one which would deter federal and state police officers from violating the fourth and 14th amendments—one which would free the courts from the stigmas necessarily generated by court approval of illicit police action. In *Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960), Mr. Justice Stewart, in answering the objections to the exclusionary rule by Justice Cardozo and Professor Wigmore[4] said at 217, 80 S.Ct. at 1444:

> Yet, however felicitous their phrasing, these objections hardly answer the basic postulate of the exclusionary rule itself. The rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it.

and further at 222–23, 80 S.Ct. at 1447:

> . . . But there is another consideration—the imperative of judicial integrity. It was of this that Mr. Justice Holmes and Mr. Justice Brandeis so eloquently spoke in *Olmstead v. United States*, 277 U.S. 438, at pages 469, 471 [48 S.Ct. 564, at pages 569, 570, 72 L.Ed. 944], more than 30 years ago. "For those who agree with me," said Mr. Justice Holmes, "no distinction can be taken between the government as prosecutor and the government as judge." 277 U.S., at page 470 [48 S.Ct. at page 575]. (Dissenting opinion.) "In a government of laws," said Mr. Justice Brandeis, "existence of the government will be imperilled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy."

One cannot read *Wolf v. Colorado, supra,* and *Mapp v. Ohio, supra,* note 3, without concluding that, in the formulation of the exclusionary rule under the fourth amendment,[5] the court was largely concerned with enforcement of the fourth amendment. Mr. Justice Frankfurter in *Wolf* discussed at length the remedies afforded by state law to the victims of unlawful searches and seizures and finally concluded (338 U.S. at 31, 69 S.Ct. at 1362) that:

> . . . it is not for this Court to condemn as falling below the minimal standards assured by the Due Process Clause a State's reliance upon other methods which, if consistently enforced, would be equally effective. Weighty testimony against such an insistence on our own view is the opinion of Mr. Justice (then Judge) Cardozo in *People v. Defore*, 242 N.Y. 13, 150 N.E. 585. (Footnote omitted.)

---

**3.** While *Wolf* was overruled in *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), the quoted proposition remains valid.

**4.** "The exclusionary rule has for decades been the subject of ardent controversy. The arguments of its antagonists and of its proponents have been so many times marshalled as to require no lengthy elaboration here. Most of what has been said in opposition to the rule was distilled in a single Cardozo sentence— 'The criminal is to go free because the constable has blundered.' *People v. Defore*, 242 N.Y. 13, 21, 150 N.E. 585, 587. The same point was made at somewhat greater length in the often quoted words of Professor Wigmore: 'Titus, you have been found guilty of conducting a lottery; Flavius, you have confessedly violated the constitution. Titus ought to suffer imprisonment for crime, and Flavius for contempt. But no! We shall let you *both* go free. We shall not punish Flavius directly, but shall do so by reversing Titus' conviction. This is our way of teaching people like Flavius to behave, and of teaching people like Titus to behave, and incidentally of securing respect for the Constitution. Our way of upholding the Constitution is not to strike at the man who breaks it, but to let off somebody else who broke something else.' 8 Wigmore Evidence (3d ed. 1940), § 2184." *Elkins v. United States, supra,* 364 U.S. at 216–17, 80 S.Ct. at 1443.

**5.** These were, of course, 14th amendment cases, but the concept involved was that expressed in the fourth amendment.

In *Mapp*, Mr. Justice Clark, who had joined the majority in *Wolf*, concerned himself with deterrents to the violation of fourth amendment rights and concluded (367 U.S. at 652–53, 81 S.Ct. at 1690) that:

> . . . [t]he experience of California that such other remedies have been worthless and futile is buttressed by the experience of other States. The obvious futility of relegating the Fourth Amendment to the protection of other remedies has, moreover, been recognized by this Court since *Wolf*.

In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court summed it all up (at 12–13, 88 S.Ct. at 1875) in these words:

> . . . Ever since its inception, the rule excluding evidence seized in violation of the Fourth Amendment has been recognized as a principal mode of discouraging lawless police conduct. See *Weeks v. United States*, 232 U.S. 383, 391–393 [34 S.Ct. 341, 344, 58 L.Ed. 652] (1914). Thus its major thrust is a deterrent one, see *Linkletter v. Walker*, 381 U.S. 618, 629–635 [85 S.Ct. 1731, 1741, 14 L.Ed.2d 601] (1965), and experience has taught that it is the only effective deterrent to police misconduct in the criminal context, and that without it the constitutional guarantee against unreasonable searches and seizures would be a mere "form of words." *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 1692, 6 L.Ed.2d 1081] (1961). The rule also serves another vital function—"the imperative of judicial integrity." *Elkins v. United States*, 364 U.S. 206, 222 [80 S.Ct. 1437, 1447, 4 L.Ed.2d 1669] (1960).

If these are the purposes of the exclusionary rule, just how does the application of the rule here serve those purposes? The majority does not condemn the action of the stopping officer; rather the stop is treated as proper at the time it was made, but, on the basis of hindsight, is held to be tainted, and the fruits of it are suppressed. That being so, the rule of this case will not protect citizens from invasions of their personal security because the stops will continue to be made with court approval. I think that, if the purposes of the exclusionary rule are not served by the application of it, it should not be applied. All that the application of the exclusionary rule accomplishes here is to free a guilty felon.

In *Whiteley v. Warden*, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971), the majority opinion does, in an arrest case, exactly what the majority opinion does in this stop case, *i. e.*, it approves the conduct of the police arresting officer[6] who arrested on the basis of information that a warrant had issued, but it then permits that conduct to be tainted by proof that the warrant of arrest was improperly issued. I appreciate that what the majority does here is to make a legally logical extension of *Whiteley* to a stop case. But at the heart of the fourth amendment is the test of reasonableness. Reasonableness may not always require that there be logical extensions of word patterns. What is reasonable in one case may not be in another, not because of some logical process, but rather because the degree of intrusion in one case is less than in another. "There is 'no ready test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search [or seizure] entails.'" *Terry v. Ohio, supra,* 392 U.S. at 21, 88 S.Ct. at 1879. Presumably it was on such a balancing that the court in *Terry* was able to hold that, although a stop was a seizure, it could be justified by founded suspicion rather than probable cause. On such balancing, I look at the state of mind of the arresting officer and find that he did what he should have done with no intent to

---

**6.** "We do not, of course, question that the Laramie police were entitled to act on the strength of the radio bulletin. Certainly police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause. Where, however, the contrary turns out to be true, an otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest." *Whiteley v. Warden, supra,* at 568, 91 S.Ct. at 1037.

flout the law. I look at the seizure and I find nothing more than the stopping of an automobile, which if not then stopped may never have been seen again, and the asking of routine questions. I look at the purpose to be served by excluding the evidence and I find none. Because I think it wrong to frustrate without purpose the search for truth, I would affirm.