901 A.2d 924

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. SALEEM T. CRAWLEY, DEFENDANT–APPELLANT.

Argued February 15, 2006—Decided July 24, 2006.

*Fruqan Mouzon* argued the cause for appellant (*Gibbons, Del Deo, Dolan, Griffinger & Vecchione,* attorneys).

*Daniel I. Bornstein,* Deputy Attorney General, argued the cause for respondent (*Zulima V. Farber,* Attorney General of New Jersey, attorney).

*Gina Mendola Longarzo* submitted a brief on behalf of amicus curiae, Association of Criminal Defense Lawyers of New Jersey (*Hack, Piro, O'Day, Merklinger, Wallace & McKenna,* attorneys).

Justice ALBIN delivered the opinion of the Court.

In this case, two police officers on patrol received a dispatch from headquarters that a person was armed with a gun outside a bar. Minutes later, near the bar, the officers sighted a man matching the description given in the dispatch and ordered him to stop for questioning. Instead, the man, later identified as defendant Saleem T. Crawley, ran. After an intense pursuit, the officers arrested defendant. Defendant was convicted of the disorderly persons offense of obstructing "a public servant from lawfully performing an official function by means of flight." *N.J.S.A.* 2C:29–1(a). Defendant claims in this appeal that because the officers engaged in an unconstitutional investigatory stop, the officers were not "lawfully performing an official function," and therefore he should have been found not guilty.

In upholding defendant's conviction, the Appellate Division determined that the investigatory stop was constitutional, finding that the officers acted based on "a reasonable articulable suspicion of criminal activity." We affirm, but for different reasons. We conclude that in relying on the dispatch from headquarters the officers were "lawfully performing an official function" when they commanded defendant to stop. Defendant's obligation to comply with that command did not depend on how a court at some later

time might decide the overall constitutionality of the street encounter. Because the officers acted in good faith and under color of their authority, defendant violated the obstructing statute when he took flight, thus endangering himself, the police, and the public.

## I.

At defendant's trial in Newark Municipal Court, the State presented its case through the testimony of Newark police officers Paul Williams and Matthew Milton. Shortly after midnight on March 15, 2002, while on patrol in a marked police car, Officers Williams and Milton received a radio dispatch reporting that there was a man armed with a gun at the Oasis Bar located on South Orange Avenue in Newark.[1] The dispatcher described the suspect as a young black male, 5'5" to 5'7" tall, weighing about 150 pounds, and wearing a green jacket, red shirt, blue jeans, and black boots. Less than two minutes later, while traveling westbound on South Orange Avenue toward the bar, the two uniformed officers observed defendant walking eastbound "at a semi-brisk pace" with his hands in his jacket pockets. Defendant matched exactly the dispatcher's description of the suspect. Officer Williams referred to that part of South Orange Avenue as "[a] very high narcotics area," and to the Oasis as a "notorious bar" known for "[a] lot of weapons offenses."

Without activating the patrol car's siren or overhead lights, the officers made a U-turn and approached defendant from behind. As the patrol car pulled up alongside defendant, Officer Williams rolled down the passenger side window and called out, "Police. Stop. I need to speak with you."[2] In response, defendant "imme-

---

[1] Officer Williams testified that there was a report of a man with a handgun. Officer Milton testified that the dispatcher described a "suspect possibly carrying a weapon."

[2] That was Officer William's recollection. Officer Milton testified that Williams rolled down his window and said to defendant, "Police. I'd like to talk to you for a minute."

diately turned and just started running." Officer Williams then pursued defendant on foot, while Officer Milton circled the block in the patrol car. Williams chased defendant through a parking lot and to an apartment complex, where defendant threw an object to the ground. Williams picked up the object, a small plastic bag, and resumed the pursuit, eventually cornering defendant at the bottom of an apartment complex stairwell. There, for the first time, the officer drew his gun. Williams arrested defendant, but found no weapon on him. The small plastic bag discarded earlier by defendant held twelve smaller plastic bags containing a white powder. A field test conducted by the officers indicated that the powder was cocaine.

Defendant gave an entirely different account of that evening's events. He testified that after leaving the home of a friend, he was walking down South Orange Avenue, when the patrol car made a U-turn. He claimed that both officers "jumped out" of the vehicle with their guns drawn, and because he was frightened, he ran. He denied that he discarded drugs.

## II.

### A.

Defendant was charged with four disorderly persons offenses: possessing and failing to deliver a controlled dangerous substance (CDS) to a law enforcement officer, in violation of *N.J.S.A.* 2C:35–10(c); possessing drug paraphernalia, in violation of *N.J.S.A.* 2C:36–2; loitering for purposes of obtaining or selling a CDS, in violation of *N.J.S.A.* 2C:33–2.1; and obstructing the administration of law or other governmental function, in violation of *N.J.S.A.* 2C:29–1.

At defendant's trial, the prosecutor presented only the empty outer bag discarded by defendant and none of the smaller bags allegedly containing cocaine, which apparently were lost. As a result, at the end of the State's case, the municipal court granted defendant's motion for a judgment of acquittal on the failing to

deliver and loitering charges. In rendering its final verdict, the court found defendant guilty of obstructing the police officers in the lawful performance of their duties and not guilty of possessing drug paraphernalia.[3] The court sentenced defendant to a one-year probationary term, along with appropriate fines, assessments, and court costs.

### B.

In a trial de novo before the Superior Court, Law Division, defendant argued that because the police officers did not have reasonable suspicion for a constitutional stop, the officers were not "lawfully performing an official function" under *N.J.S.A.* 2C:29–1(a). He thus contended that his flight could not be the basis for a conviction. In rejecting that analysis, Superior Court Judge John C. Kennedy held that "[p]olice action which is reasonable under the totality of the circumstances, though mistaken from a constitutional perspective, is not 'unlawful' under *N.J.S.A.* 2C:29–1(a)." Accordingly, Judge Kennedy determined that he was not required to decide whether the police officers conducted "a constitutionally permissible investigatory stop," but only whether their actions were "objectively reasonable."

In reviewing the municipal court record, Judge Kennedy found that (1) the officers received a dispatch of a man with a gun in an area known for weapons offenses and narcotics activity; (2) the officers acted reasonably in investigating a reported crime; (3) defendant exactly fit the description of the suspect in the dispatch; (4) a uniformed police officer "unambiguously" told defendant to stop; and (5) defendant's flight created a "grave risk of injury to both the police officers and others." Judge Kennedy stressed that merely because the police might have stepped over a constitutionally imposed line, that did not allow defendant to ignore a police

---

[3] The drug paraphernalia possession charge was premised on defendant's possession of the outer plastic bag, which, as noted, was the only physical evidence produced by the State.

order and thus "to risk the safety of the officers or others by embarking upon a flight." Under those circumstances, Judge Kennedy concluded that defendant's flight constituted a violation of *N.J.S.A.* 2C:29–1(a), and therefore he found defendant guilty of the obstructing charge. Judge Kennedy sentenced defendant to the same probationary term he received in municipal court and imposed appropriate fees and penalties.

## C.

In an unpublished opinion, the Appellate Division affirmed defendant's conviction. Unlike the Law Division, the panel directly addressed the constitutionality of the police encounter with defendant and found that the investigatory stop was based on reasonable suspicion. Because the panel held that the stop complied with both the Fourth Amendment of the Federal Constitution and Article I, Paragraph 7 of the New Jersey Constitution, it followed that the police officers were acting "lawfully" under the obstruction statute.

In reaching its decision, the panel first rejected the State's argument that defendant had waived his constitutional claim by failing to challenge the lawfulness of his seizure in a motion to suppress filed pursuant to *Rule* 3:5–7. The panel noted that the issue on appeal did not concern whether illegally obtained evidence should be suppressed; after all, defendant did not move to suppress any evidence. Rather, according to the panel, the issue concerned "whether defendant's flight from the police can be constitutionally criminalized," a matter properly raised in the context of the trial itself.

Next, the panel accepted that "defendant was detained or 'stopped' for investigatory purposes." Because the panel found that the "investigatory stop was based on specific and articulable facts which ... gave rise to a reasonable suspicion of criminal activity," it concluded that the stop was constitutional and there-

fore defendant's flight "constituted a proper basis for a violation of *N.J.S.A.* 2C:29–1a."[4]

We granted defendant's petition for certification. 185 *N.J.* 297, 884 *A.*2d 1266 (2005). We also granted the Association of Criminal Defense Lawyers of New Jersey leave to participate as amicus curiae.

## III.

We must determine whether defendant, when he ran from the police after receiving an order to stop for questioning, violated *N.J.S.A.* 2C:29–1. That statute provides:

> A person commits an offense if he purposely obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from lawfully performing an official function by means of flight, intimidation, force, violence, or physical interference or obstacle, or by means of any independently unlawful act.
>
> [*N.J.S.A.* 2C:29–1(a).]

To obtain a conviction under the obstructing statute, the State was required to prove beyond a reasonable doubt that defendant purposely obstructed Officers Williams and Milton "from lawfully performing an official function by means of flight." Simply put, the question here is whether the two officers, who relied on a dispatch describing an armed man in the area of a bar, were "lawfully performing an official function" when they sought to stop and question defendant.

## A.

We begin by noting our agreement with the Appellate Division that defendant was not required to raise his constitutional claim in a motion to suppress under *Rule* 3:5–7. That rule provides that "a

---

[4] Defendant also argued on appeal that *N.J.S.A.* 2C:29–1 was facially unconstitutional because it criminalized constitutionally protected conduct. Because the court decided the issue based on the constitutionality of the investigatory stop of defendant, it rejected as irrelevant defendant's facial challenge to the constitutionality of the act, which, the panel reasoned, "would only be pertinent if we were reviewing a field inquiry as the prelude to the charge."

person claiming to be aggrieved by an unlawful search and seizure and having reasonable grounds to believe that the evidence obtained may be used against him or her in a penal proceeding" may file a motion to suppress that evidence. *R.* 3:5–7(a). Defendant was not seeking to suppress potentially damaging evidence acquired through an alleged unreasonable search or seizure. Defendant simply contended that because the stop was an unconstitutional seizure, the State did not prove that the police officers were "lawfully performing an official function"—an element of the offense of obstruction. The State had the burden of proving that the officers were acting "lawfully," however that term is defined. In challenging the evidence of guilt, defendant was entitled to argue that if the officers acted unconstitutionally, they could not have acted "lawfully" under the statute. That challenge did not require the filing of a suppression motion pursuant to *Rule* 3:5–7.

## B.

We next turn to the central issue in this case, whether Officers Williams and Milton were "lawfully performing an official function" when they commanded defendant to stop. If they were not "lawfully performing" their duties, then the State failed to establish an essential element of obstructing. Because defendant and the State dispute the meaning of those words, we must determine what the Legislature intended when it enacted *N.J.S.A.* 2C:29–1.

Defendant essentially maintains that as a matter of common usage, the terms "lawful" and "constitutional" are interchangeable. Defendant urges that if police officers conduct an unconstitutional stop, they necessarily cannot be "lawfully performing an official function." Applying that principle to the facts, defendant asserts that Officers Williams and Milton did not possess the reasonable suspicion required by the Federal and State Constitutions to justify an investigatory stop and therefore could not have been acting "lawfully" pursuant to the statute. Under that construct, with the State falling short of proving an element of obstruction, defendant would be entitled to an acquittal despite his flight.

The State, on the other hand, contends that the encounter met the constitutional test for an investigatory stop. Alternatively, and more importantly, the State submits that defendant's obligation to obey the police officers' command to stop did not depend on whether a court might later decide that the officers possessed the requisite suspicion for the stop. The State basically reasons that an after-the-fact constitutional analysis in the calm and reflective atmosphere of a courtroom does not alter whether the officers were lawfully performing their duties for purposes of the statute. Any other interpretation of the statute, according to the State, would invite a person in a street encounter to flee or resist a police command if he believed the police lacked the constitutional authority for the stop. From the State's viewpoint, when police officers, under color of their authority and in good faith, order a person to stop for questioning based on a dispatch from headquarters, that person violates the obstructing statute if he attempts to thwart the police by fleeing.

## C.

As noted earlier, the Appellate Division concluded that the police officers engaged in a constitutional investigatory stop and, by definition, were "lawfully performing an official function." We agree with the Appellate Division that there is substantial credible evidence in the record to support the findings of the municipal court and Law Division that Officer Williams ordered defendant to stop for questioning, and that defendant clearly understood that command. Thus, we also agree that defendant was "seized" for purposes of our Federal and State Constitutions. *See State v. Stovall,* 170 *N.J.* 346, 355, 788 *A.*2d 746 (2002) (stating that Article I, Paragraph 7 of New Jersey Constitution and Fourth Amendment to United States Constitution "protect a person's right to be free from unreasonable searches and seizures," and that seizure occurs when, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave" (internal quotation marks and alteration omitted)).

The much more difficult question is whether that seizure, which occurred pursuant to an investigatory stop, was reasonable under our Federal and State Constitutions. *See State v. Pineiro*, 181 *N.J.* 13, 20, 853 *A.*2d 887 (2004) ("[A]n investigatory stop, sometimes referred to as a *Terry* stop, is valid 'if it is based on specific and articulable facts which, taken together with rational inferences from those facts, give rise to a reasonable suspicion of criminal activity.' " (quoting *State v. Nishina*, 175 *N.J.* 502, 510–11, 816 *A.*2d 153 (2003)) (footnote omitted)). We need not resolve whether the investigatory stop in this case met that constitutional standard because, ultimately, we conclude that under *N.J.S.A.* 2C:29–1 a police officer acting on a dispatch may be "lawfully performing an official function" even if a court later determines that reasonable suspicion was lacking to justify the stop.[5] *See Donadio v. Cunningham*, 58 *N.J.* 309, 325–26, 277 *A.*2d 375 (1971) ("[A] court should not reach and determine a constitutional issue unless absolutely imperative in the disposition of the litigation.").

We are persuaded that the Legislature, in enacting the current version of *N.J.S.A.* 2C:29–1, did not intend that a person involved in a police encounter should have an incentive to flee or resist, thus endangering himself, the police, and the innocent public. In this case, defendant's headlong flight triggered a dangerous pursuit by police officers who thought defendant was armed with a gun. We believe that the Legislature intended that, when a police officer is acting in good faith and under color of his authority, a person must obey the officer's order to stop and may not take

---

[5] We acknowledge that the facts of this case are in many respects similar to those in *Florida v. J.L.*, 529 *U.S.* 266, 120 *S.Ct.* 1375, 146 *L.Ed.*2d 254 (2000). In that case, police received a tip from an anonymous caller that "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." *Id.* at 268, 120 *S.Ct.* at 1377, 146 *L.Ed.*2d at 258–59. Within minutes, the officers responded, saw a person at the bus stop matching the description, and, based on nothing more than the anonymous tip, approached and frisked the suspect. *Id.* at 268, 120 *S.Ct.* at 1377, 146 *L.Ed.*2d at 259. The Court held "that an anonymous tip lacking indicia of reliability ... does not justify a stop and frisk whenever and however it alleges the illegal possession of a firearm." *Id.* at 274, 120 *S.Ct.* at 1380, 146 *L.Ed.*2d at 262.

flight without violating *N.J.S.A.* 2C:29–1. We have reached that conclusion by following standard principles of statutory construction.

## IV.

The paramount goal in interpreting a statute is to divine the intent of the Legislature. *DiProspero v. Penn,* 183 *N.J.* 477, 492, 874 *A.2d* 1039 (2005). In doing so, we first look to the plain language of the statute. *Ibid.* If the statutory language is ambiguous and could lead to more than one plausible interpretation, we may turn to legislative history, including a sponsor's statement, as well as other interpretative aids. *Id.* at 492–93, 874 *A.2d* 1039. Although "[w]e ascribe to the statutory words their ordinary meaning and significance," we do not read them in a vacuum, but rather "in context with related provisions so as to give sense to the legislation as a whole." *Id.* at 492, 874 *A.2d* 1039. We do not read the language literally if that would lead to an absurd result or a result completely at odds with the overall statutory scheme. *Aponte–Correa v. Allstate Ins. Co.,* 162 *N.J.* 318, 323, 744 *A.2d* 175 (2000) ("Where a literal reading will lead to a result not in accord with the essential purpose and design of the act, the spirit of the law will control the letter."); *Bd. of Educ. v. Caffiero,* 86 *N.J.* 308, 317, 431 *A.2d* 799 ("A statute should not be read literally where such a reading is contrary to its purposes."), *appeal dismissed,* 454 *U.S.* 1025, 102 *S.Ct.* 560, 70 *L.Ed.2d* 470 (1981). In construing a statute, we attempt to capture the essence of the law—its logic, sense, and spirit—to achieve a result contemplated by the Legislature. *Aponte–Correa, supra,* 162 *N.J.* at 323, 744 *A.2d* 175 (stating that goal of statutory interpretation is "to effectuate the fundamental purpose for which the legislation was enacted" (internal quotation marks omitted)).

## A.

The State and defendant hotly dispute the import of the words "lawfully performing an official function" in the context of *N.J.S.A.*

2C:29–1 and surrounding statutes. Because the face of the statute might suggest plausible alternate interpretations, we next look at related statutes and legislative history to shed light on the contested language. *See* 2B Norman J. Singer, *Sutherland Statutory Construction* § 51.03 (5th ed. 1992) ("Statutes are considered to be in pari materia when they relate to the same person or thing, to the same class of persons or things, or have the same purpose or object." (footnote omitted)).

We first review a related statute, *N.J.S.A.* 2C:29–2, which makes it a crime to resist arrest or elude the police. Subsection (a) of that statute makes it a fourth-degree crime if a person "by flight, purposely prevents or attempts to prevent a law enforcement officer from effecting an arrest." *N.J.S.A.* 2C:29–2(a)(2). By the express terms of the statute, a person has no right to resist arrest by flight or any other means, even if the arrest constitutes an unreasonable seizure under the constitution. *N.J.S.A.* 2C:29–2(a) provides: "It is not a defense to a prosecution [for resisting arrest] that the law enforcement officer was acting unlawfully in making the arrest, provided he was acting under color of his official authority and provided the law enforcement officer announces his intention to arrest prior to the resistance." That provision codified this State's then-existing common law, which required that a person submit to an arrest, even if illegal. *See State v. Mulvihill,* 57 *N.J.* 151, 155–56, 270 *A.*2d 277 (1970) ("[I]n our State[,] when an officer makes an arrest, legal or illegal, it is the duty of the citizen to submit."); *State v. Koonce,* 89 *N.J.Super.* 169, 184, 214 *A.*2d 428 (App.Div.1965) ("[W]e declare it to be the law of this State that a private citizen may not use force to resist arrest by one he knows or has good reason to believe is an authorized police officer engaged in the performance of his duties, whether or not the arrest is illegal under the circumstances obtaining.").

This State's pre-Code common law rule forbidding resistance to an arrest when police officers act in good faith and under color of their authority furthered the important public policy of discourag-

ing self-help. The policy recognized that in a society governed by laws our courts are the proper forum for challenges to the misuse of official power and for the vindication of rights. It was understood that resisting arrest greatly increases the likelihood of physical harm to both the arresting officers and the suspect, as well as to innocent bystanders. Addressing that subject in *State v. Koonce, supra,* Judge Conford wrote that a system of ordered liberty cannot tolerate "any formulation [of the law] which validates an arrestee's resistance of a police officer with force merely because the arrest is ultimately adjudged to have been illegal." 89 *N.J.Super.* at 183, 214 *A.*2d 428. Judge Conford further elaborated on the point:

Force begets force, and escalation into bloodshed is a frequent probability. The right or wrong of an arrest is often a matter of close debate as to which even lawyers and judges may differ. In this era of constantly expanding legal protections of the rights of the accused in criminal proceedings, one deeming himself illegally arrested can reasonably be asked to submit peaceably to arrest by a police officer, and to take recourse in his legal remedies for regaining his liberty and defending the ensuing prosecution against him. At the same time, police officers attempting in good faith, although mistakenly, to perform their duties in effecting an arrest should be relieved of the threat of physical harm at the hands of the arrestee.

[*Id.* at 183–84, 214 *A.*2d 428.]

Similarly, under the eluding statute, *N.J.S.A.* 2C:29–2(b), a person driving a motor vehicle who receives a police order to stop must comply, whether or not the police have met the applicable constitutional standard to justify the stop. That statute provides that a person commits a crime if "while operating a motor vehicle ... [he] knowingly flees or attempts to elude any police or law enforcement officer after having received any signal from such officer to bring the vehicle ... to a full stop." *N.J.S.A.* 2C:29–2(b). Unlike the resisting arrest statute, *N.J.S.A.* 2C:29–2(b) does not explicitly state that an unlawful stop is not a defense to eluding. Nevertheless, in *State v. Seymour,* 289 *N.J.Super.* 80, 86–87, 672 *A.*2d 1273 (App.Div.1996), the Appellate Division applied "the same public policy considerations" expressed in *Koonce, supra,* and held that a person is guilty of eluding if he fails "to bring his vehicle to a full stop immediately after receiving any law

enforcement officer's signal, whether the officer's stop of the vehicle is legal or illegal." The Appellate Division recognized that flight "from the police in a motor vehicle with the police in vehicular pursuit could endanger defendant, the officer, other motorist[s], or pedestrians." *Seymour, supra,* 289 *N.J.Super.* at 87, 672 *A.*2d 1273. Likewise, in a prosecution for escape "from a prison or other custodial facility," *N.J.S.A.* 2C:29–5(d) eliminates any defense based on "[i]rregularity in bringing about or maintaining detention, or lack of jurisdiction of the committing or detaining authority."

Those sister statutes to the obstructing statute, either in their express language or by judicial construction, declare that a defendant has no right to commit the crime of resisting arrest, eluding, or escape in response to an unconstitutional stop or detention. For compelling public safety reasons, the resisting arrest, eluding, and escape statutes and interpretive case law require that a defendant submit to an illegal detention and that he take his challenge to court.[6] *See State v. Casimono,* 250 *N.J.Super.* 173, 183, 593 *A.*2d 827 (App.Div.1991) ("There is a solid line of authority in other jurisdictions holding that an illegal detention or search ordinarily will not bar a conviction for an assault, escape or other unlawful response committed by the person subjected to the

---

[6] Examples abound of defendants whose flight from the police set in motion an ensuing chase that resulted in death or serious injury either to a police officer, a suspect, or a bystander. *See, e.g., Levandoski v. Cone,* 267 *Conn.* 651, 841 *A.*2d 208, 211 (2004) (describing police encounter with suspect who fled into nearby woods where pursuing officer fell off ledge suffering severe injuries); *People v. Hickman,* 59 *Ill.*2d 89, 319 *N.E.*2d 511, 511–12 (1974) (describing police chase of fleeing burglars that resulted in one officer accidentally shooting to death fellow officer), *cert. denied,* 421 *U.S.* 913, 95 *S.Ct.* 1571, 43 *L.Ed.*2d 779 (1975); *People v. Zierlion,* 16 *Ill.*2d 217, 157 *N.E.*2d 72, 72–73 (1959) (describing police shooting of fleeing suspects, one fatally, after disregard of police commands); *Rucker v. Harford County,* 316 *Md.* 275, 558 *A.*2d 399, 400 (1989) (describing police chase of theft suspect through cornfield that resulted in shooting of civilian bystander); *State v. Mendoza,* 80 *Wis.*2d 122, 258 *N.W.*2d 260, 263–64 (1977) (describing shooting deaths of two police officers by fleeing suspect).

unlawful police action."), *certif. denied,* 127 *N.J.* 558, 606 *A.*2d 370, *cert. denied,* 504 *U.S.* 924, 112 *S.Ct.* 1978, 118 *L.Ed.*2d 577 (1992).

The same public policy concerns underlying those statutes equally apply to the obstructing statute, *N.J.S.A.* 2C:29–1. When defendant fled after Officer Williams told him to stop, he instigated a nighttime police chase, with one officer in pursuit on foot and another in a patrol car, through an apartment complex in a dangerous section of Newark. Because the officers received a report that defendant was armed, they undoubtedly were concerned for their personal safety and prepared to use deadly force if necessary. Indeed, when Officer Williams cornered defendant in an apartment complex stairwell, he pulled his service revolver. In short, defendant's failure to obey a police command and the ensuing pursuit created a substantial risk of harm to the police officers, defendant, and unsuspecting members of the public.

## B.

We are not persuaded that the Legislature intended the textual differences between the obstructing statute and its sister statutes to lead to an outcome at odds with the overall statutory scheme or an outcome with absurd results. Under defendant's construct, if the police officer had called out, "Stop, you're under arrest," his flight would have subjected him to a resisting arrest conviction under *N.J.S.A.* 2C:29–2(a), despite an unconstitutional seizure. If defendant had been in a car and the officers signaled for him to stop and pull over to the side of the road, his flight would have subjected him to an eluding conviction under *N.J.S.A.* 2C:29–2(b), despite an unconstitutional seizure. However, defendant argues that because the police officer said only, "Stop. I need to speak with you," his flight does not subject him to an obstruction conviction under *N.J.S.A.* 2C:29–1.

We cannot conclude that the Legislature intended to penalize a suspect's flight under the resisting arrest and eluding statutes, but not under the obstructing statute, when in all three circumstances a police stop is later adjudged constitutionally improper. Stated

another way, we cannot believe that the Legislature intended to protect police officers and the public when flight is from an attempted arrest or motor vehicle stop, but not from an attempted investigatory stop. After all, defendant's refusal to obey the officer's command to stop set off a chase along with the attendant danger of escalating violence no different than if he had disobeyed a command to submit to an arrest. It can hardly be expected that police officers receiving a dispatch describing an armed man would do nothing when they came face-to-face with that man.

█ It is understood "that effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and that officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information." *United States v. Robinson*, 536 *F*.2d 1298, 1299 (9th Cir.1976); *see also United States v. Hensley*, 469 *U.S.* 221, 230–31, 105 *S.Ct.* 675, 681, 83 *L.Ed.*2d 604, 613 (1985) (explaining that information possessed by dispatcher was imputed to responding police officers, and that dispatcher's knowledge, not responding officers', was essential for determining probable cause); *Whiteley v. Warden of Wyo. State Penitentiary*, 401 *U.S.* 560, 568, 91 *S.Ct.* 1031, 1037, 28 *L.Ed.*2d 306, 313 (1971) (holding that police who arrested and searched defendant were entitled to rely and act on radio bulletin and stating that "police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause"). For example, if the dispatcher in this case had been provided adequate facts from a reliable informant to establish a reasonable suspicion that defendant was armed, common sense tells us that the dispatcher had the power to delegate the actual stop to officers in the field. *See Robinson, supra,* 536 *F*.2d at 1300. On the other hand, if the information received by the dispatcher or headquarters fell short of the suspicion required by law for an investigatory stop, the fact that Officers Williams and

Milton relied in good faith on the dispatch would not make the stop a constitutional one. *See ibid.* Ultimately, the State must prove that a warrantless, investigatory stop was based on reasonable and articulable suspicion, and failing that any evidence obtained as a result of an unconstitutional stop must be suppressed. *See id.* at 1299–1300.

However, a person has no constitutional right to endanger the lives of the police and public by fleeing or resisting a stop, even though a judge may later determine the stop was unsupported by reasonable and articulable suspicion. *See United States ex rel. Kilheffer v. Plowfield,* 409 *F.Supp.* 677, 680 (E.D.Pa.1976) (holding that "absent unusual circumstances there exists no ... federal constitutional right" to resist unlawful arrest); *People v. Curtis,* 70 *Cal.*2d 347, 74 *Cal.Rptr.* 713, 450 *P.*2d 33, 36–37 (1969) (holding that duty to refrain from resisting unlawful arrest does not violate Fourth Amendment prohibition against unreasonable seizures); *Ellison v. State,* 410 *A.*2d 519, 524–26 (Del.Super.Ct.1979) (holding that defendant had no Fourth Amendment right to resist unconstitutional arrest by fleeing), *aff'd,* 437 *A.*2d 1127 (Del.1981) (per curiam), *cert. denied,* 455 *U.S.* 1026, 102 *S.Ct.* 1730, 72 *L.Ed.*2d 147 (1982); *State v. Mather,* 28 *Wash.App.* 700, 626 *P.*2d 44, 47 (1981) ("The constitutional right to be free from unreasonable searches and seizures does not create a constitutional right to react unreasonably to an illegal detention. The police power, therefore, may lawfully extend to prohibiting flight from an unlawful detention where that flight indicates a wanton and wilful disregard for the life and property of others." (footnote omitted)); *see also Evans v. City of Bakersfield,* 22 *Cal.App.*4th 321, 27 *Cal.Rptr.*2d 406, 412, 413 (1994) (concluding that "self-help not infrequently causes far graver consequences for both the officer and the suspect than does the unlawful arrest itself" and for similar reasons, "there is no right to use force, reasonable or otherwise, to resist an unlawful detention"); *Elliott v. State,* 230 *Ga.App.* 855, 497 *S.E.*2d 817, 819 (1998) (holding that defendant did not have "right to flee a police stop upon his unilateral determination that the stop was pretextual"); *State v. Laughlin,* 281 *Mont.* 179, 933 *P.*2d 813, 814–15 (1997)

(finding no right to resist unlawful arrest); *Am. Fork City v. Pena–Flores,* 14 *P.*3d 698, 701 (Utah Ct.App.2000) ("So long as a police officer is acting within the scope of his or her authority and the detention or arrest has the indicia of being lawful, a person can be guilty of interfering with a peace officer even when the arrest or detention is later determined to be unlawful."), *aff'd,* 63 *P.*3d 675 (Utah 2002).

Although those cases deal mostly with resisting arrest, we see no practical or public-policy-based distinction between fleeing from an arrest and fleeing from an investigatory detention. *See Melson v. Municipality of Anchorage,* 60 *P.*3d 199, 201–02 (Alaska Ct. App.2002) (noting that safety-driven policy considerations requiring person not to flee from unconstitutional arrest "apply just as strongly to investigative stops"). A person has no constitutional right to use an improper stop as justification to commit the new and distinct offense of resisting arrest, eluding, escape, or obstruction, thus precipitating a dangerous chase that could have deadly consequences. *See United States v. Bailey,* 691 *F.*2d 1009, 1017 (11th Cir.1982) ("[W]here the defendant's response [to police action] is itself a new, distinct crime, there are strong policy reasons for permitting the police to arrest him for that crime. A contrary rule would virtually immunize a defendant from prosecution for all crimes he might commit that have a sufficient causal connection to the police misconduct."), *cert. denied,* 461 *U.S.* 933, 103 *S.Ct.* 2098, 77 *L.Ed.*2d 306 (1983). Quite simply, in a society governed by the rule of law, constitutional decisionmaking cannot be left to a suspect in the street. *See Koonce, supra,* 89 *N.J.Super.* at 183–84, 214 *A.*2d 428.

We must be mindful that a suspect who is the subject of an arrest, a motor vehicle stop, or an investigatory stop is not privy to the information motivating the police action. Therefore, while on the street, the suspect is in no position to challenge the information possessed by the police. The suspect may in fact have committed no offense, but he cannot be the judge of his own cause and take matters into his own hands and resist or take flight. The

proper forum to challenge supposed unlawful police conduct is in court. *See Curtis, supra,* 74 *Cal.Rptr.* 713, 450 *P.*2d at 37 ("There is no constitutional impediment to the state's policy of removing controversies over the legality of an arrest from the streets to the courtroom.").

The conclusion that *N.J.S.A.* 2C:29–1 should be construed to require submission even to an unlawful stop is reinforced by the statutory history of the 2000 amendment to the obstructing statute. The 2000 amendment added "flight" as one means by which a person could "prevent[ ] or attempt[ ] to prevent a public servant from lawfully performing an official function" in violation of the obstructing statute. *L.* 2000, *c.* 18, § 1. The Senate Judiciary Committee Statement to Senate Bill No. 828 provided that the new law would "specifically include 'flight' as an activity prohibited by the provisions of 2C:29–1. An example of the type of conduct that this change is intended to cover would be flight to avoid being questioned by a law enforcement officer." Senate Judiciary Committee, *Statement to Senate Bill No. 828,* at 1 (Feb. 17, 2000).

We hold that a defendant may be convicted of obstruction under *N.J.S.A.* 2C:29–1 when he flees from an investigatory stop, despite a later finding that the police action was unconstitutional. That is so even though, had defendant only held his ground, the unconstitutional stop would have resulted in the suppression of evidence seized from him.[7] In summary, *N.J.S.A.* 2C:29–1 makes it a crime to obstruct a police officer "lawfully performing an official function by means of flight." Viewing the statute in relation to the resisting arrest, eluding, and escape statutes, we construe "lawfully performing an official function" to mean a police officer acting in objective good faith, under color of law in the execution of his

---

[7] We disapprove of the statement in *State v. Williams,* 381 *N.J.Super.* 572, 577, 887 *A.*2d 190 (App.Div.2005), that "a citizen's non-violent flight from an [unconstitutional] search and seizure cannot be validly criminalized" under *N.J.S.A.* 2C:29–1. As we have discussed, any flight from police detention is fraught with the potential for violence because flight will incite a pursuit, which in turn will endanger the suspect, the police, and innocent bystanders.

duties.[8]  *Cf. State v. Lashinsky*, 81 *N.J.* 1, 11, 404 *A.*2d 1121 (1979) ("[W]here an officer's instructions are obviously reasonable, in furtherance of his duties, an individual toward whom such instructions are directed has a correlative duty to obey them.  If his refusal to respond results in an obstruction of the performance of the officer's proper tasks, this will constitute a violation of the disorderly persons statute." (citation omitted)).[9]

## C.

■  We next determine that because Officers Williams and Milton acted in objective good faith and under color of their authority in attempting an investigatory stop of defendant, they were "lawfully performing an official function."  At approximately 12:10 a.m., while on patrol, the two uniformed officers received a dispatch describing a man armed with a gun outside the Oasis Bar, an establishment notorious for "[a] lot of weapons offenses." Less than two minutes later, the officers saw defendant, who

---

[8] We emphasize that a prerequisite for a conviction under *N.J.S.A.* 2C:29–1 is that the police officer act in good faith.  Among other things, good faith means "honesty in belief or purpose" and "faithfulness to one's duty or obligation." *Black's Law Dictionary* 701 (7th ed.1999).  A police officer who *reasonably* relies on information from headquarters in responding to an emergency or public safety threat may be said to be acting in good faith under the statute.  However, a police officer who without any basis arbitrarily detains a person on the street would not be acting in good faith.  Contrary to any suggestion by our dissenting colleagues, *post* at 468, 901 *A.*2d at 940, for purposes of *N.J.S.A.* 2C:29–1, good faith is an objective, not a subjective, standard.

[9] Defendant's reliance on United States Supreme Court cases reviewing stop-and-identify statutes is misplaced.  Both *Hiibel v. Sixth Judicial District Court*, 542 *U.S.* 177, 124 *S.Ct.* 2451, 159 *L.Ed.*2d 292 (2004), and *Brown v. Texas*, 443 *U.S.* 47, 99 *S.Ct.* 2637, 61 *L.Ed.*2d 357 (1979), held that a suspect's refusal to provide identification could not be criminalized unless the police had reasonable suspicion for the stop.  *Hiibel, supra*, 542 *U.S.* at 184, 187–89, 124 *S.Ct.* at 2457, 2459–60, 159 *L.Ed.*2d at 302, 304; *Brown, supra*, 443 *U.S.* at 52–53, 99 *S.Ct.* at 2641, 61 *L.Ed.*2d at 363.  Those cases are inapposite because failure to identify oneself does not create a danger to police or the public.  A person's headlong flight in the face of a police request to stop involves risks and hazards that are not present when a person merely refuses to identify himself to the police.

precisely fit the dispatcher's description of the armed suspect, walking on the same street as the bar. Relying on the dispatcher's information and acting with precaution, the officers attempted to stop and talk to defendant. We see nothing unreasonable about the steps taken by those officers. The report of a man walking the streets of Newark with a gun is a clear and present danger that requires prompt investigation. The failure to act would have constituted a dereliction of duty.

In conclusion, we find that sufficient credible evidence in the record supports the findings that Officers Williams and Milton reasonably relied on a dispatch from headquarters and therefore were "lawfully performing an official function"—an attempted investigatory stop—when defendant obstructed their efforts by fleeing.

## V.

For the reasons explained in this opinion, we affirm the judgment of the Appellate Division upholding defendant's conviction of obstruction in violation of *N.J.S.A.* 2C:29–1.

Justice WALLACE, JR., dissenting.

I respectfully dissent. I do not agree with the majority's conclusion that a police officer is "lawfully performing an official function" under *N.J.S.A.* 2C:29–1(a) when he makes an invalid investigatory stop. I agree with the Appellate panel's observation that if the police contact with defendant was a field inquiry, "then defendant would have been free to leave the area and his failure to heed the officer's request to stop and speak with the officers could not have been criminalized." Because I conclude that the police lacked articulable suspicion to perform a valid investigatory stop, but could have conducted a field inquiry, defendant's flight was not a violation of the obstruction statute, *N.J.S.A.* 2C:29–1.

Patrolman Williams testified that he and Patrolman Milton drove past defendant, who matched the description in an anonymous report of an armed individual at the Oasis Bar. Milton made

a u-turn and approached defendant from the rear. Williams rolled down his window and said, "Police. Stop. I need to speak with you" or "I need to talk to you." Milton recalled that Williams said, "Police. I'd like to talk to you for a minute." Both officers agreed that defendant ran in response. The trial court convicted defendant of violating *N.J.S.A.* 2C:29–1.

When interpreting a statute, this Court's role is to effectuate the will of the Legislature. *State v. Brannon,* 178 *N.J.* 500, 505, 842 *A.*2d 148 (2004). We look first to the language of the statute. *Id.* at 506, 842 *A.*2d 148. "If the statute is clear and unambiguous on its face and admits of only one interpretation, we need delve no deeper than the act's literal terms to divine the Legislature's intent." *State v. Butler,* 89 *N.J.* 220, 226, 445 *A.*2d 399 (1982) (citations omitted). If the statute is not clear or is ambiguous, courts must look beyond its literal language to determine the legislative intent. *Id.* at 226–27, 445 *A.*2d 399. "However, in criminal cases we are guided by the rule of lenity, which requires us to construe penal statutes strictly and interpret ambiguous language in favor of a criminal defendant." *State v. Livingston,* 172 *N.J.* 209, 218, 797 *A.*2d 153 (2002).

The clear language of *N.J.S.A.* 2C:29–1, which criminalizes "prevent[ing] or attempt[ing] to prevent a public servant from lawfully performing an official function by means of flight," requires that the public servant be engaged in a lawful official function for an individual's flight to be in violation of the statute. I reach that conclusion by the plain reading of the statute and by examination of similar statutes that do not use the word "lawfully." For example, *N.J.S.A.* 2C:29–2(b), which pertains to eluding, provides that "any person, while operating a motor vehicle . . ., who knowingly flees or attempts to elude any police or any law enforcement officer after having received any signal from such officer to bring the vehicle . . . to a full stop commits a crime . . ." *Ibid.* Unlike the obstruction statute, the Legislature did not condition an eluding conviction on the law enforcement officer engaging in a lawful signal.

Similarly, *N.J.S.A.* 2C:29–2(a), resisting arrest, was amended in 2000 to provide that "a person is guilty of a disorderly persons offense if he purposely prevents ... a law enforcement officer from effecting an arrest." *N.J.S.A.* 2C:29–2(a)(1). The amendment deleted the word "lawful" before the word "arrest." Thus, the Legislature removed the language requiring a lawful arrest and added language to explicitly allow an individual to be convicted of resisting arrest regardless of whether the arrest was lawful or not. *N.J.S.A.* 2C:29–2(a)(3)(b).

Notably, the Legislature did not eliminate "lawfully" from *N.J.S.A.* 2C:29–1, when it amended *N.J.S.A.* 2C:29–2a in 2000. Consequently, I find the relevant language of *N.J.S.A.* 2C:29–1 to be clear and unambiguous. The Legislature intended that the public servant must be "lawfully performing" an "official function" for the statute to criminalize flight.

Although the majority recognizes that the sister statutes to *N.J.S.A.* 2C:29–1 do not require "lawful" conduct by the police, it surmises that the Legislature did not intend "the textual differences between the obstructing statute and its sister statutes to lead to an outcome at odds with the overall statutory scheme or an outcome with absurd results." *Ante* at 456, 901 *A.*2d at 933. I disagree. The majority, in its effort to reach a reasonable, but wrong, decision, ignores the plain meaning of the statute requirement and eliminates the rule of construction that we construe penal statutes strictly. It also overlooks the fact that the basis for the rule of lenity is a "fear that expansive judicial interpretations will create penalties not originally intended by the Legislature." *State v. Wooten,* 73 *N.J.* 317, 326, 374 *A.*2d 1204 (1977) (citation omitted).

Moreover, the out-of-state cases cited by the majority were decided under different statutory schemes and, therefore, provide no guidance for deciding this case. Unlike the situation in most of those cited cases that concerned arrests, the majority opinion interprets *N.J.S.A.* 2C:29–1 to apply to police conduct that would violate a defendant's right to leave a police encounter and does not

address whether the police were conducting a lawful investigatory stop or a field inquiry. In my view, if the stop was a lawful investigatory stop, then the obstruction statute applies. If it was a field inquiry, then the statute does not apply to criminalize defendant's flight.

The next step in this analysis is to determine whether the police conducted a lawful investigatory stop. On several occasions, we have reviewed the constitutionally permissible forms of warrantless police encounters with citizens. *State v. Pineiro,* 181 *N.J.* 13, 20, 853 *A.*2d 887 (2004); *State v. Nishina,* 175 *N.J.* 502, 510–11, 816 *A.*2d 153 (2003); *State v. Maryland,* 167 *N.J.* 471, 482–83, 771 *A.*2d 1220 (2001). Those encounters may be based on probable cause to arrest, reasonable articulable suspicion to conduct an investigatory stop, or a field inquiry. It is not disputed that in the present case, the police lacked probable cause to arrest defendant, thus, we need only consider whether the encounter was an investigatory stop or a field inquiry.

An investigatory stop, also referred to as a *Terry*[10] stop, is valid if it is based on "specific and articulable facts which, taken together with rational inferences from those facts, give rise to a reasonable suspicion of criminal activity." *Nishina, supra,* 175 *N.J.* at 511, 816 *A.*2d 153 (quotation omitted).

A field inquiry occurs when a police officer approaches an individual and asks "if [the person] is willing to answer some questions." *Id.* at 510, 816 *A.*2d 153 (quotation omitted). Such questioning is permissible so long as it is "not harassing, overbearing, or accusatory in nature." *Ibid.* (citation omitted). "The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way." *Maryland, supra,* 167 *N.J.* at 483, 771 *A.*2d 1220, (quoting *Florida v. Royer,* 460 *U.S.* 491, 497–98, 103 *S.Ct.* 1319, 1324, 75 *L.Ed.*2d 229, 236 (1983)) (citations omitted).

---

[10] *Terry v. Ohio,* 392 *U.S.* 1, 88 *S.Ct.* 1868, 20 *L.Ed.*2d 889 (1968).

In the present case, it is obvious that the police were attempting to make a *Terry* stop. Thus, I look to whether there were specific and articulable facts that gave rise to a reasonable suspicion of criminal activity to warrant such a stop. Police asserted that the reason for the stop was that defendant fit the anonymous tipster's description of the person who possessed a gun.

When the source of the report is unknown, the United States Supreme Court requires more than a tip to validate an investigatory stop and frisk. *Florida v. J.L.*, 529 *U.S.* 266, 120 *S.Ct.* 1375, 146 *L.Ed.*2d 254 (2000). In *J.L., supra*, an anonymous caller informed the police that a young black male wearing a plaid shirt was standing at a particular bus stop and was carrying a gun. 529 *U.S.* at 268, 120 *S.Ct.* at 1377, 146 *L.Ed.*2d at 259. The police arrived at the bus stop and observed three black males, one of whom was wearing a plaid shirt. *Ibid.* The police arrested the man fitting the description, and a search revealed a gun. *Ibid.* The Supreme Court unanimously held that the tipster's information was not sufficiently reliable to justify the stop and frisk that revealed the handgun in the defendant's possession. *Id.* at 271–72, 120 *S.Ct.* at 1379, 146 *L.Ed.*2d at 260–61. Writing for the Court, Justice Ginsburg explained that

> [t]he anonymous call concerning [the defendant] provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility. That the allegation about the gun turned out to be correct does not suggest that the officers, prior to the frisks, had a reasonable basis for suspecting [the defendant] of engaging in unlawful conduct. The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search. All the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about [the defendant].
>
> [*Id.* at 271, 120 *S.Ct.* at 1379, 146 *L.Ed.*2d at 260–61.]

In addressing the accurate description of a subject's readily observable location and appearance, Justice Ginsburg explained that such information "will help the police correctly identify the person whom the tipster means to accuse," but "[t]he reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a

determinate person." *Id.* at 272, 120 *S.Ct.* at 1379, 146 *L.Ed.*2d at 261.

This Court addressed a similar issue in *State v. Rodriguez*, 172 *N.J.* 117, 796 *A.*2d 857 (2002). In that case, an anonymous caller informed the police that two men carrying drugs would return from Philadelphia by bus between 3:30 p.m. and 5 p.m. *Id.* at 121, 796 *A.*2d 857. The caller gave a detailed description of the men. *Id.* at 121–22, 796 *A.*2d 857. Around 4:45 p.m., the police observed two men fitting the description exit a bus from Philadelphia. *Ibid.* The police approached the men, who agreed to talk and subsequently consented to a search. *Id.* at 124, 796 *A.*2d 857. The search revealed drugs and more than $630 in cash. *Ibid.* This Court determined that the stop was unlawful. *Id.* at 125, 796 *A.*2d 857. We explained that

> [a]n anonymous tip, standing alone, is rarely sufficient to establish a reasonable articulable suspicion of criminal activity. The United States Supreme Court has warned that the veracity of persons supplying anonymous tips is by hypothesis largely unknown, and unknowable. That Court also has instructed that an informant's veracity, "reliability," and "basis of knowledge" are relevant in determining the value of his report. To justify action based on an anonymous tip, the police in the typical case must verify that the tip is reliable by some independent corroborative effort.
>
> Generally, if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable. Stated differently, courts have found no constitutional violation when there has been independent corroboration by the police of significant aspects of the informer's predictions[.] The analysis in any given case turns ultimately on the totality of the circumstances.
>
> [*Id.* at 127–28, 796 *A.*2d 857 (citations and quotations omitted).]

Applying the teachings of *J.L.* and *Rodriguez* to the present case, I conclude that the physical description received from the unknown source was not reliable because the tip did not demonstrate "that the tipster [had] knowledge of concealed criminal activity." *J.L., supra,* 529 *U.S.* at 272, 120 *S.Ct.* at 1379, 146 *L.Ed.*2d at 261. There was no indication that the tip was reliable in its assertion that the suspect illegally possessed a weapon. Moreover, the tipster's claim that defendant had a gun was never corroborated before or after defendant was apprehended. Thus, the "veracity" and the "basis of knowledge" to establish the

reliability of the asserted illegality was absent. Consequently, I conclude that the police lacked a reasonable suspicion of criminal activity to justify an investigatory stop.

To be sure, upon receiving the anonymous tip the police could lawfully approach defendant and seek his permission to talk to him, thereby engaging a field inquiry. However, when police conduct a field inquiry, there is no lawful requirement that an individual acquiesce to questioning. Therefore, defendant here had a constitutional right to leave the scene. *See Maryland, supra,* 167 *N.J.* at 483, 771 *A.*2d 1220.

Previously, we explained that in some circumstances flight is not prohibited conduct. *State v. Tucker,* 136 *N.J.* 158, 169, 642 *A.*2d 401 (1994). We observed in *Tucker* that some people "may not feel entirely comfortable in the presence of some, if not all, police is regrettable but true." *Ibid.* Although flight upon encountering police is not to be encouraged, standing alone, such flight is insufficient to justify an investigatory stop. *Id.* at 170, 642 *A.*2d 401.

Moreover, contrary to the majority's position, I find no justification to impose a good faith exception. "We have recognized previously that an officer's subjective good faith cannot 'justify an infringement of a citizen's constitutionally guaranteed rights.'" *Rodriguez, supra,* 172 *N.J.* at 129, 796 *A.*2d 857 (quoting *State v. Arthur,* 149 *N.J.* 1, 8, 691 *A.*2d 808 (1997)).

I conclude that based on the totality of circumstances, the police lacked sufficient reliable information to conduct an investigatory stop, but could have conducted a field inquiry. Because defendant may lawfully depart from a field inquiry, his departure did not violate *N.J.S.A.* 2C:29–1.

For the reasons expressed, I dissent from the majority's conclusion that a person may be guilty of violating *N.J.S.A.* 2C:29–1 by exercising his or her constitutional right to depart from a field inquiry.

Justice LONG joins in this opinion.

*For affirmance*—Chief Justice PORITZ and Justices LaVECCHIA, ZAZZALI, ALBIN and RIVERA–SOTO—5.

*For reversal*—Justices LONG and WALLACE—2.