**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-2960-23
     A-2961-23
     A-2967-23
     A-3632-23

STATE OF NEW JERSEY,

  Plaintiff-Respondent,

v.

JUSTIN RODWELL,
a/k/a JUSTIN DUDDY,

  Defendant-Appellant.

_____

STATE OF NEW JERSEY,

  Plaintiff-Respondent,

v.

JAYKIL A. RODWELL,

  Defendant-Appellant.

_____

STATE OF NEW JERSEY,

  Plaintiff-Respondent,

v.

JASPER D. SPIVEY,
a/k/a DANNY RODWELL,

      Defendant-Appellant.

_____

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

BRANDEN K. RODWELL,

      Defendant-Appellant.

_____

> Argued October 16, 2025 – Decided October 27, 2025
>
> Before Judges Mawla and Puglisi.
>
> On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 21-09-1649.
>
> Colin Sheehan, Assistant Deputy Public Defender, argued the cause for appellant Justin Rodwell in A-2960-23 (Jennifer N. Sellitti, Public Defender, attorney; Colin Sheehan, of counsel and on the briefs).
>
> Nadine Kronis, Assistant Deputy Public Defender, argued the cause for appellant Jaykil A. Rodwell in A-2961-23 (Jennifer N. Sellitti, Public Defender, attorney; Nadine Kronis, of counsel and on the briefs).

Jennifer N. Sellitti, Public Defender, attorney for appellant Jasper D. Spivey in A-2967-23 (John P. Flynn, Assistant Deputy Public Defender, of counsel and on the briefs).

Jennifer N. Sellitti, Public Defender, attorney for appellant Branden K. Rodwell in A-3632-23 (Margaret McLane, Assistant Deputy Public Defender, of counsel and on the briefs).

Shep A. Gerszberg, Assistant Prosecutor, argued the cause for respondent (Theodore N. Stephens II, Essex County Prosecutor, attorney; Shep A. Gerszberg, of counsel and on the briefs).

PER CURIAM

In these four back-to-back appeals, defendants Justin Rodwell, Jaykil A. Rodwell, Jasper D. Spivey, and Branden K. Rodwell appeal from their May 2, 2024 judgments of conviction for obstruction, N.J.S.A. 2C:29-1(a). We affirm.

On June 1, 2021, Newark Police Detectives Michael DaSilva and Christopher Serrano, and Essex County Prosecutor's Office Lieutenant Paul Ranges drove to a residence on Cypress Street in Newark around 1:30 p.m. The officers wore plain clothes and were in unmarked vehicles. Detective Serrano drove a black Ford sedan with Detective DaSilva as the passenger and behind them, Lieutenant Ranges drove a black Dodge sedan.

The officers were assigned to the area because of a recent rise in criminal activity. Detective DaSilva testified his duties in the Criminal Intelligence

Section required him to "respond to various locations" experiencing "a spike in violent crimes." He and Detective Serrano received their location assignments every shift during roll call. Detective DaSilva testified they went to Cypress Street because there were two shootings in the "immediate area" in the preceding weeks, on May 17 and 24. Detective Serrano testified the officers were in the area because of complaints narcotics were being bought and sold there.

According to Detective DaSilva, he and Detective Serrano were about two car lengths away when he "saw a group of males," including Jaykil,[1] Justin, and Spivey. However, his "attention was drawn to Jaykil." Detective DaSilva had a body worn camera (BWC) but did not turn it on before exiting his vehicle. Detective Serrano activated his BWC, but footage was lost after the camera was destroyed.

Detectives DaSilva and Serrano both testified Jaykil took a few "steps back" and seemed "startled" by their presence. Jaykil appeared to be looking around for a way to escape. The BWC did not capture this aspect of the officers' observations. Detective DaSilva admitted on cross-examination Jaykil did not attempt to leave as the vehicles approached. However, Spivey stepped away

---

[1] Because several defendants share the same surname we refer to them by their first names. We intend no disrespect.

A-2960-23

from the group when they approached, which Detective DaSilva believed was a ploy to "deflect attention" from the rest of the group.

Detective DaSilva observed Jaykil acting suspiciously as he maneuvered a fanny pack he was wearing over his shoulder, away from the officer's vantage point. The BWC footage only showed the bag once, briefly, after the officers got out of their vehicles. Lieutenant Ranges testified he was unsure why the officers stopped at this location.

Detective DaSilva testified that "based on [Jaykil's] behavior when he saw [the officers'] presence," he and Detective Serrano exited the vehicle "to further investigate" the situation. Both detectives testified they identified themselves as police when they exited their vehicle.

As Detective DaSilva approached the group, Jaykil put his body between the detective and the fanny pack. Detective DaSilva testified Jaykil and Spivey's behaviors led him to believe the bag contained a firearm and, based on a fear Jaykil could quickly retrieve the firearm, he thought it safer not to ask for the bag, and instead, reached for the bag to maintain "a little element of surprise." Seven seconds elapsed between Detective DaSilva exiting the vehicle and when he grabbed the bag.

5

Detective DaSilva testified when he grabbed the bag, he "felt the presence of a firearm inside." Without telling him he was being detained, Detective DaSilva grabbed Jaykil's left arm "to place him under arrest." Detective Serrano and Lieutenant Ranges testified Detective DaSilva said there was a firearm. The BWC footage does not reflect this statement.

Detective DaSilva testified Jaykil then pushed him and "started to . . . run towards Detective Serrano and Lieutenant Ranges." Detective Serrano grabbed Jaykil, whose momentum forced the detective out of the road and onto the sidewalk. Detective DaSilva testified he had no further interaction with Jaykil after Detective Serrano and Lieutenant Ranges got ahold of him. At this point, Justin and Spivey began "pushing and tussling" the officers as they tried to arrest Jaykil. Detective DaSilva got hold of the fanny pack, but Justin started pushing the detective towards a parked van with an open sliding door. As Justin pushed him, Detective DaSilva turned on his BWC and repeatedly yelled, "stop," in an attempt "to de[-]escalate the situation."

Spivey approached Detective DaSilva and tried to wrestle the fanny pack away from him. According to Detective DaSilva, Spivey punched him in the chest, knocking his BWC to the ground. Spivey and the detective fell, and as Detective DaSilva lay on top of the fanny pack, he could feel a handgun in the

6

bag pressing against his chest. Spivey placed the detective in a chokehold, so Detective Serrano punched Spivey in the face causing him to release Detective DaSilva.

After Detective Serrano punched Spivey, Branden "tackled" Detective Serrano, and he fell to the ground. There was a "big pile up on the ground" and Spivey grabbed the fanny pack. Detective Serrano grabbed Spivey's waist to prevent him from escaping with the bag but was "forced to let him go" after what "felt like a kick in the head." Detective DaSilva testified "Spivey just took off" with the bag.

Lieutenant Ranges testified he was holding onto Jaykil when Spivey ran "off across the street." The lieutenant let go of Jaykil, lifted Branden off Detective Serrano, and restrained him in a "bear hug." According to Lieutenant Ranges, Jaykil got away at some point after he let him go.

After Spivey and Jaykil left, Detective DaSilva retrieved his BWC. Justin then approached Detective DaSilva and began "[r]esisting [his] control . . . trying to push [Detective DaSilva] off." Detective DaSilva testified Justin "struck [his] chest," causing his BWC to fall off a second time.

A-2960-23

Detective Serrano testified he ran into the street to find Spivey and the bag after the other officers pulled Branden off him. He could not determine where Spivey went, so he returned to help Lieutenant Ranges arrest Branden.

Detective Darren Sinclair and his partner Officer Gabriel Gonzalez arrived at the scene around 1:45 p.m. Detective Sinclair commanded Branden to put his hands behind his back, and when he did not comply, ordered the other officers to "take him to the ground."

Detective Sinclair was wearing a BWC, but it became dislodged and there was no footage of the incident on it. Detective DaSilva's BWC footage showed Branden stating he would not run away and repeatedly asking the officers to cuff his hands in front of his body, rather than behind, before placing him in the police car. The footage showed officers take Branden to the ground and pull his arms behind his back before handcuffing him.

A grand jury indicted defendants on several offenses, which were later downgraded. Ultimately, defendants were charged with the disorderly persons offenses of: simple assault on Detective DaSilva, Detective Serrano, and Lieutenant Ranges, N.J.S.A. 2C:12-1(a); obstruction, N.J.S.A. 2C:29-1(a); and resisting arrest, N.J.S.A. 2C:29-2(a)(1). Prior to trial, Jaykil filed notice he intended to raise self-defense, N.J.S.A. 2C:3-4, as an affirmative defense.

A-2960-23

Following a two-day bench trial, in which the State presented testimony from five witnesses, including Detectives DaSilva, Serrano, and Sinclair, and Lieutenant Ranges, the trial judge issued a written opinion on April 23, 2024. The judge acquitted defendants of simple assault and resisting arrest but convicted them of obstruction. Each defendant was sentenced to pay fines and fees.

The trial judge found the officers acted in good faith and under the color of law by investigating Jaykil because "they believed that a gun was in the fanny pack." She rejected defendants' arguments that the interaction was random or arbitrary, noting "the officers' demeanor and immediate commands to defendants made it abundantly clear . . . defendants knew . . . Detective[s] DaSilva and . . . Serrano were law enforcement officers . . . attempting to investigate Jaykil." Although the "officers never stated explicitly . . . [Jaykil] was under arrest[,] . . . the totality of the circumstances presented indicate [the] officers were in fact attempting to" arrest him. However, "the interference of the other co-defendants prevented . . . [the] officers from having an opportunity to place [Jaykil] under arrest," and he "couldn't comply even if he wanted to because he was being pulled in multiple ways [by] both officers and co-defendants."

The judge found Spivey, Justin, and Branden guilty of obstruction because they "w[ere] fully aware [the] officers were attempting to investigate" Jaykil, yet they acted to prevent his arrest. Spivey and Branden "began pushing and shoving officers[,] . . . preventing them from successfully" arresting Jaykil. Branden refused to be handcuffed from behind. His "refusal to comply created the scenario for which he was taken down by several officers." Justin "jumped in the confusion long enough to allow Jaykil[] . . . to leave the immediate scene with the fanny pack." The judge found Detective DaSilva's BWC footage depicted Justin and Spivey "intentionally disrupting officers from placing Jaykil . . . in handcuffs by pulling Jaykil . . . [away] from the officers, placing themselves in between the officers, and attempting to gain possession of [the] fanny pack." Crediting Detective DaSilva's testimony that he felt a gun in the fanny pack while he was pinned down, the judge concluded Spivey's "affirmative actions interfered with[,] and ultimately prevented[,] law enforcement officers from performing their official duties."

Like his co-defendants, Jaykil was found guilty of obstruction. The judge reasoned Detective DaSilva "clearly expressed that the main focus of his investigation" was Jaykil and the bag in his possession. Jaykil interfered with the investigation because he was "seen [on the BWC footage] throwing the fanny

10

pack" to Justin and Spivey, "as officers engage in a melee with the co-defendants." The judge also credited Lieutenant Ranges's testimony Jaykil fled the scene with Spivey and "the fanny pack that was briefly recovered by Det[ective] DaSilva." Therefore, Jaykil was guilty by "throwing the fanny pack, followed by flight with the object in the midst of an ongoing investigation by law enforcement."

## I.

In A-2960-23, A-2961-23, and A-3632-23, Justin, Jaykil, and Branden each raise the following point for our consideration:

> THE OBSTRUCTION CONVICTION MUST BE VACATED AND A JUDGMENT OF ACQUITTAL ENTERED BECAUSE THE POLICE DID NOT ACT IN GOOD FAITH WHEN THEY WHOLLY ARBITRARILY PHYSICALLY ACCOSTED A GROUP OF MEN STANDING OUTSIDE THEIR HOME.

In A-2967-23, Spivey raises the following points on appeal:

> POINT I
>
> REGARDLESS OF THE STANDARD OF REVIEW, THIS COURT MUST REVERSE THE OBSTRUCTION CONVICTION AND ENTER A JUDGMENT OF ACQUITTAL BECAUSE THE STATE DID NOT PROVE THAT THE OFFICERS WERE OBJECTIVELY ACTING IN GOOD FAITH AND UNDER THE COLOR OF LAW.

11

POINT II

THE OFFICERS' FLAGRANT, ARBITRARY, AND UNCONSTITUTIONAL ACTIONS REFLECT IMPLICIT BIAS AND CANNOT OBJECTIVELY BE CONSIDERED TO BE IN GOOD FAITH.

We review a decision following bench trial for "sufficient credible evidence in the record to support the judge's determination." State ex rel. R.V., 280 N.J. Super. 118, 121 (App. Div. 1995). A trial judge sitting without a jury must "state clearly [their] factual findings and correlate them with the relevant legal conclusions." State v. Locurto, 157 N.J. 463, 470 (1999) (quoting Curtis v. Finneran, 83 N.J. 563, 570 (1980)). "When the reviewing court is satisfied that the findings and result meet this criterion, its task is complete and it should not disturb the result . . . ." Id. at 471 (quoting State v. Johnson, 42 N.J. 146, 162 (1964)). We reverse only if the trial court's findings and legal conclusions were "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974).

II.

All four defendants argue we should reverse the obstruction convictions because the State did not prove the officers were acting in good faith or under

12

color of law. They claim the trial judge's finding otherwise is not supported by the evidence in the record.

A person is guilty of obstruction

> if [they] purposely obstruct[], impair[,] or pervert[] the administration of law or other governmental function or prevent[] or attempt[] to prevent a public servant from lawfully performing an official function by means of flight, intimidation, force, violence, or physical interference or obstacle, or by means of any independently unlawful act. This section does not apply to failure to perform a legal duty other than an official duty, or any other means of avoiding compliance with law without affirmative interference with governmental functions.
>
> [N.J.S.A. 2C:29-1(a).]

Under the statute, "lawfully performing an official function" means the officer acted in "objective good faith, under color of law in the execution of [their] duties." State v. Crawley, 187 N.J. 440, 460-61 (2006); cf. State v. Lashinsky, 81 N.J. 1, 11 (1979) (concluding individuals have a duty to obey an officer's "obviously reasonable instructions"). Crawley construed "good faith" to mean "honesty in belief or purpose" and "faithfulness to one's duty or obligation." 187 N.J. at 461 n.8. An "officer who[,] without any basis[,] arbitrarily detains a person on the street[,] would not be acting in good faith." Ibid. However, an investigatory stop later found to be unconstitutional, does

13

not necessarily mean officers acted arbitrarily, or "take[ the] case outside of the purview of the obstruction statute." State v. Williams, 192 N.J. 1, 13 (2007).

The trial judge found all the State's witnesses credible, including the officers who testified as fact witnesses. She concluded the officers were acting in good faith and under color of law in investigating Jaykil and the fanny pack. The officers were patrolling "due to recent criminal activity in the area," and commenced the interaction with defendants after observing Jaykil's suspicious "movements[ and] behavior," out of concern there was a firearm in the fanny pack he was holding. The judge credited the officers' belief the fanny pack contained a firearm, based on their experience making "many arrests involving guns" and observation "guns were often discovered in fanny packs."

We can discern no error in these findings. The evidence in the record supports the judge's finding the officers were acting in good faith and under color of law. The record does not support defendants' contentions the officer set upon them arbitrarily or on a whim.

Defendants point us to a 2014 Department of Justice (DOJ) report regarding the Newark Police Department, which concluded most police stops analyzed by the DOJ between 2009 and 2012, were unconstitutional. They allege this supports their contentions the officers in their case were not acting in

good faith.  Setting aside whether data more than a decade old is relevant, and that defendants did not raise the issue at trial, we are unconvinced there was error because the trial judge correctly found under Crawley the officers could have been acting in good faith notwithstanding the constitutionality of the initial stop.  "A defendant may be convicted of obstruction under N.J.S.A. 2C:29-1 . . . despite a later finding that the police action was unconstitutional."  Crawley, 187 N.J. at 460.

The judge's findings the State proved obstruction were sound.  The statute defines obstruction as "flight, intimidation, force, violence, or physical interference or obstacle, or by means of any independently unlawful act."  N.J.S.A. 2C:29-1(a).  "[A] defendant commits the crime of obstruction if [they] disobey[] a police command and flee[] from an investigatory stop."  Williams, 192 N.J. at 4 (citing Crawley, 187 N.J. at 460).

The trial judge correctly found defendants acted purposely because they "w[ere] fully aware that officers were attempting to investigate" Jaykil and the fanny pack and tried to prevent his arrest.  She also made detailed findings as to why defendants could not have mistaken the officers for anything other than law enforcement.  Indeed, she observed during the melee Detective DaSilva yelled "stop," attempted to deescalate the situation, and called for backup on his radio.

The judge broke down each defendant's obstructive behavior. Spivey and Justin pushed and shoved officers, "preventing them from successfully performing the arrest," and Branden joined in the melee and refused police orders to be handcuffed from behind. Justin "pushed . . . [Detective] DaSilva into a nearby van," and "jumped in the confusion long enough to allow Jaykil[] . . . to leave the immediate scene." When Detective Serrano and Lieutenant Ranges "were attempting to detain Jaykil," Justin and Spivey "interfere[d] by pulling Jaykil . . . away from the officers." Spivey wrestled the fanny pack away from Detective DaSilva before he fled the scene with it, and after Lieutenant Ranges let go of Jaykil, he fled the scene as well. The BWC footage and the officers' testimony support these findings.

Jaykil argues his conviction cannot stand because the trial judge erroneously found he threw the fanny pack to Justin and Spivey, yet there is no evidence to support such a finding. He claims the judge failed to address the fact he was fleeing the scene for his personal safety because it was not obvious the officers were attempting to arrest or engage in other official police duties. The judge also did not address his affirmative defense. We reject these contentions.

16

The purpose of the obstruction statute is "to prohibit a broad range of behavior designed to impede or defeat the lawful operation of government." Final Rep. of the N.J. Crim. L. Revision Comm'n, Vol. II, § 2C:29-1 Commentary, at 280 (1971); State v. Camillo, 382 N.J. Super. 113, 116-17 (App. Div. 2005). Police officers are public servants. State v. Bullock, 136 N.J. 149, 153 (1994). Their official functions include patrols and investigatory stops. See Crawley, 187 N.J. at 461-62; Williams, 192 N.J. at 10.

A defendant does not have a right to "obstruct the police, or escape 'in response to an unconstitutional stop or detention.'" State v. Herrerra, 211 N.J. 308, 334-35 (2012) (quoting Crawley, 187 N.J. at 455). The defendant's actions must be assessed "in light of [a]ll the surrounding circumstances[,] the activity giving rise to a police[ officer]'s order, the reasonableness of that order itself[,] and the defendant's reaction to it." Lashinsky, 81 N.J. at 10. When an officer's statements and commands are "reasonable, in furtherance of [their] duties, an individual toward whom such instructions are directed has a correlative duty to obey." Id. at 11.

Although the trial judge erred when she found Jaykil threw the fanny pack to Justin and Spivey, the obstruction offense was based on more, namely, Jaykil fleeing the scene where officers were trying to arrest him. The record does not

support Jaykil's claim he left for safety reasons. Moreover, the contention he was fleeing for self-preservation purposes is predicated on the claim police were not operating in good faith and under color of law, which we and the trial judge have rejected.

The affirmative defense of self-defense exists when a person "reasonably believes . . . such force is immediately necessary for the purpose of protecting [themself] against the use of unlawful force by . . . other person[s]." N.J.S.A. 2C:3-4. Such force is limited and may be unjustified when used "[t]o resist an arrest which the actor knows is being made by a peace officer in the performance of [their] duties." N.J.S.A. 2C:3-4(b)(1)(a). If a person knows "that if [they] desist[] from [their] physically defensive measures and submit[] to arrest[,] the officer's unlawfully excessive force would cease, the arrestee must desist or lose [their] privilege of self-defense." State v. Mulvihill, 57 N.J. 151, 157 (1970).

Self-defense was inapplicable in Jaykil's case. The trial judge found: no evidence the officers used unlawful force on Jaykil; it was clear they were police officers; he was under investigation; and therefore, he was subject to their reasonable commands.

A-2960-23

To the extent we have not addressed an argument raised in these appeals, it is because it lacks sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed in A-2960-23, A-2961-23, A-2967-23, and A-3632-23.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division