SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**Jari Almonte v. Township of Union** (A-73-24) (090169)

**Argued November 17, 2025 -- Decided June 25, 2026**

**JUSTICE HOFFMAN, writing for a unanimous Court.**

In this appeal, the Court considers whether the paramedics who rendered advanced life support (ALS) services to Jeremy Almonte, along with their employer, are immune from liability for civil damages pursuant to the Emergency Medical Services Act (EMSA). The version of the EMSA that controls this appeal was adopted in 1984. At that time, N.J.S.A. 26:2K-14 immunized paramedics who perform advanced life support services "in good faith" and "in accordance with [the EMSA]." The latter requirement, which is at issue in plaintiffs' challenge, is fulfilled if paramedics (1) "maintain direct voice communication with" and (2) "are taking orders from a licensed physician" while providing ALS. Id. at -10.

On pages 3 through 7 of its opinion, the Court provides a detailed account of the events of the evening of August 18, 2012. The account is derived from the report of the Atlantic Ambulance paramedics who responded to the call placed by Almonte's mother when Almonte began convulsing after falling while running; the transcripts of the paramedics' two calls with Dr. Niti Sharma, M.D., a licensed physician working in the Emergency Department at Overlook Medical Center; and the report of the attending physician at University Hospital. During the first call, Dr. Sharma instructed the ALS Emergency Medical Technicians (EMTs) to administer Valium. As Almonte's heart rate continued to drop, the EMTs called Dr. Sharma again and received instructions to administer additional medications and to intubate Almonte. The ambulance arrived at the hospital following an unsuccessful intubation attempt. The ALS EMTs made a second and then a third intubation attempt, with the latter deemed successful, before Almonte was transported into the hospital. When he arrived at the Trauma Center, Almonte was in cardiac arrest. He was reintubated and resuscitated; his breathing returned. Almonte was discharged from the hospital on September 25, 2012. He was diagnosed with anoxic brain injury, along with a number of significant physiological repercussions.

Plaintiffs filed a complaint against Atlantic Ambulance Corporation, the paramedics, and others, alleging that their negligent, careless, reckless, willful, and wanton acts caused Almonte's injuries. Defendants moved for summary judgment,

1

maintaining that the paramedic immunity statute shields the paramedics from liability because they rendered ALS services "in accordance with [the EMSA]." The trial court granted the motion and dismissed plaintiffs' complaint. The Appellate Division affirmed. The Court granted certification, limited to whether the paramedics should be granted "immunity under N.J.S.A. 26:2K-14," which depends upon whether "they acted 'in accordance with the act.'" 260 N.J. 616 (2025).

**HELD:** The paramedics who provided care to Jeremy Almonte acted under the "orders" of Dr. Sharma to intubate Almonte in an effort to open his airway, and those orders were conveyed during "direct voice communication[s]" with Dr. Sharma. Accordingly, defendants are entitled to immunity based on the plain language of N.J.S.A. 26:2K-10 (1984), aided by legislative intent.

1. In 1973, the Legislature enacted the Emergency Medical Services Act to grant qualified immunity to persons who provide medical assistance in emergency situations. In 1984, the Legislature repealed the 1973 EMSA and replaced it with N.J.S.A. 26:2K-7 to -20 to broaden the situations in which mobile intensive care personnel may act, yet simultaneously regulate their qualifications so as to ensure the quality of the emergency service rendered. Under the 1984 legislation, a mobile intensive care paramedic, like those who treated Almonte, may perform ALS services provided, as relevant here, that they "maintain direct voice communication with and are taking orders from a licensed physician." N.J.S.A. 26:2K-10. The phrase "maintain direct voice communication" is not defined in the EMSA and appears only in N.J.S.A. 26:2K-10. N.J.S.A. 26:2K-14 specifically states: "No mobile intensive care paramedic . . . shall be liable for any civil damages as the result of an act or the omission of an act committed while in training for or in the rendering of advanced life support services in good faith and in accordance with this act." Under that provision, a paramedic may act "negligently" yet still be immune from civil liability. (pp. 15-18)

2. Here, the paramedics' interventions -- they intravenously administered doses of muscle relaxant and sedative medications to Almonte, monitored his heart rate through an electrocardiogram, and utilized endotracheal intubation, an adjunctive ventilation device -- fell squarely within the definition of ALS services set forth in N.J.S.A. 26:2K-7(a) (1984). (pp. 19-20)

3. Further, through their two mobile telephone calls to Dr. Sharma -- at 9:17 and 9:30 p.m. -- the paramedics "maintain[ed] direct voice communication" within the meaning of N.J.S.A. 26:2K-10 (1984). Although the word "maintain" has multiple meanings, the Sponsors' Statement to the 1984 law expressly provides that the purpose of the amendments to the EMSA was to "broaden" the "situations" in which paramedics "may act" and to immunize paramedics for rendering such "acts" if they "maintain direct voice communication with a physician." Plaintiffs assert that the

2

paramedics' "silence" for seventeen minutes while attempting to intubate after their second call to Dr. Sharma was inconsistent with "maintain[ing] direct voice communication," and they further argue that a significant change in a patient's circumstances, such as a patient's decline in heart rate or the ambulance's arrival at the hospital, mandates reestablishing contact with the medical command physician. The Legislature, however, did not specify a cadence for "direct communication" with the physician, nor did it impose criteria for intervening events that require recontact. Such a requirement would undermine the Legislature's intent to enable paramedics to act in high-stakes situations without fear of tort liability. The discretion paramedics are afforded and the time constraints under which they operate counsel against interpreting "maintain[ing] direct communication" to require paramedics to divert from the crisis at hand and to contact the physician at set intervals or upon specific undesignated, intervening events. (pp. 20-25)

4. Finally, the contents of the paramedics' phone calls with Dr. Sharma clearly establish that they were "taking orders from a licensed physician" within the meaning of N.J.S.A. 26:2K-10 (1984). Reviewing testimony, the Court finds that Dr. Sharma's initial authorization to intubate Almonte was sufficient to span the seven-minute timeframe during which multiple intubation attempts were made. And a statement accompanying the 1984 law explains that paramedics may perform duties that are "necessary to assume the orderly transfer of advanced life support care . . . to hospital staff upon arrival at an emergency room." Here, the paramedics testified that transporting Almonte to the emergency room staff before establishing an open airway would have been "reckless." Thus, they continued to perform the "necessary" task of intubation. (pp. 25-27)

5. The Court explains why reliance on N.J.A.C. 8:41-8.5(b)(1), which provides that a "difficult intubation" "shall not delay the transportation of a patient," is misplaced. Even assuming the regulations are relevant to the paramedics' immunity analysis despite the absence of a reference to the regulations in the paramedic immunity statute, they "cease to be operative once contact is made with the medical command physician." N.J.A.C. 8:41-8.2(d). Here, the paramedics who rendered ALS services to Almonte acted under Dr. Sharma's order to intubate, which she conveyed during two mobile telephone calls. Because the paramedics "maintain[ed] direct voice communication with" and "t[ook] orders from a licensed physician," defendants are entitled to immunity under N.J.S.A. 26:2K-14 (1984). (pp. 27-30)

**AFFIRMED.**

**CHIEF JUSTICE RABNER and JUSTICES PATTERSON, PIERRE-LOUIS, WAINER APTER, FASCIALE, and NORIEGA join in JUSTICE HOFFMAN's opinion.**

3

SUPREME COURT OF NEW JERSEY
A-73 September Term 2024
090169

Jari Almonte and Yahaira
Almanzar, individually and
as parents and natural guardians
of Jeremy Almonte, an infant,

Plaintiffs-Appellants,

v.

Township of Union,
Township of Union Fire
Department, and Township
of Union Volunteer
Ambulance Squad,

Defendants,

and

Atlantic Ambulance
Corporation, Union Emergency
Medical Unit, Daniel Pernell,
Denyel Cusimano, R. Iungerman,
"John" Biedrzycki, Niti Sharma, M.D.,
and Overlook Medical Center,

Defendants-Respondents.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
| --- | --- |
| November 17, 2025 | June 25, 2026 |

Brian J. Shoot a member of the New York bar, admitted pro hac vice, argued the cause for appellants (Sullivan Papain Block McManus Coffinas & Cannavo, attorneys; Hugh M. Turk, on the briefs).

Scott D. Musoff argued the cause for respondents (Skadden, Arps, Slate, Meagher & Flom, and Connell Foley, attorneys; Scott D. Musoff and Andrew Muscato, of counsel and on the brief, and Jeffrey W. Moryan and Susan Kwiatkowski, on the brief).

JUSTICE HOFFMAN delivered the opinion of the Court.

"[N]o tragedy is more wrenching than the helpless apprehension of the death or serious injury of one whose very existence is a precious treasure." Portee v. Jaffee, 84 N.J. 88, 97 (1980). We acknowledge, at the outset, the profound tragedy presented by this matter and the significant impact it has had on all parties involved.

This case requires us to determine whether the paramedics who rendered advanced life support services to Jeremy Almonte, along with the institutional entity responsible for employing them, are immune from liability for civil damages pursuant to the Emergency Medical Services Act (EMSA), N.J.S.A. 26:2K-7 to -20. The EMSA immunizes paramedics who perform advanced life support services "in good faith" and "in accordance with [the EMSA]." N.J.S.A. 26:2K-14 (1984). The latter requirement, which is at issue in plaintiffs' challenge, is fulfilled if paramedics (1) "maintain direct voice

2

communication with" and (2) "are taking orders from a licensed physician" while providing advanced life support services.  Id. at -10.

We conclude that the paramedics who provided care to Jeremy Almonte acted under the "orders" of Dr. Niti Sharma, M.D., a licensed physician working in the Emergency Department at Overlook Medical Center in Summit, to intubate Almonte in an effort to open his airway; we also have determined that those orders were conveyed during "direct voice communication[s]" with Dr. Sharma.  Accordingly, we hold that defendants are entitled to immunity. We reach this holding based on N.J.S.A. 26:2K-10's plain language, aided by legislative intent.

### I.

### A.

Because the factual circumstances are critical to an analysis of whether the paramedics "maintain[ed] direct voice communication with" and "t[ook] orders from" a licensed physician when they treated Almonte, we set forth a detailed account of the events on the evening of August 18, 2012, derived from the report of the Atlantic Ambulance paramedics, the transcripts of their two cellular telephone calls with Dr. Sharma, and the report of the attending physician at University Hospital.

> **8:56 p.m.**  Jeremy Almonte's mother called 9-1-1 immediately after observing her twenty-one-month-old son fall and strike his head on a

3

hardwood floor while running and playing in their Vauxhall home. After the fall, Almonte's face and neck began "twitching," "which rapidly progressed into full body convulsions."

**9:00 p.m.** Basic life support (BLS) Emergency Medical Technicians (EMTs) arrived at the Almonte home. They found Almonte with a fist-sized lump on the rear of his head and reported that he was actively seizing and "unresponsive" but breathing on his own. Almonte was "vomiting large amounts of fluid from his oral and nasal airway." The BLS EMTs administered oxygen, suctioned fluid from Almonte's airway, and loaded him into an ambulance.

**9:10 p.m.** Advanced life support (ALS) paramedics employed by the Atlantic Ambulance Corporation, David Pernell and Denyel Cusimano (the paramedics), arrived and assumed care of Almonte. Almonte remained "unresponsive," with his lips blue, extremities cool to the touch, and jaw clenched shut; his breathing became "labored" and he continued to actively seize.[1]

**9:17 p.m.** Pernell placed the first cellular phone call to Dr. Sharma. Pernell described Almonte's condition and conveyed his recommendations in the following exchange:

> PERNELL: We have a two-year-old, he's about [sixteen kilograms]. Apparently he fell from a standing height and he's been seizing ever since . . . . Right now his heart rate is about 170 . . . .

---

[1] The paramedics' report describes Almonte's breathing as labored or agonal, at different points in time. "Labored" breathing is defined as "difficult breathing," or "breathlessness," which can be caused by an "obstruction to the flow of air into and out of the lungs." Oxford Concise Medical Dictionary 200 (5th ed. 1998). "Agonal" breathing is defined as "[a]n abnormal breathing pattern . . . characterized by labored breaths, gasping, and, often, [muscle jerks] and grunting." Agonal Respiration, Nat'l Libr. of Med., https://www. ncbi.nlm.nih.gov/medgen/746160 (last visited June 17, 2026). Such a breathing pattern occurs when the patient has reached a more life-threatening stage. Oxford Concise Medical Dictionary 14.

And right now we've gotta give this kid . . . Versed to stop the seizure[s] . . . or Valium.

. . . .

DR. SHARMA: You can give him . . . one milligram [of Valium].

. . . .

PERNELL: Okay. I'm going to give him one milligram . . . . And in the event that we have to deal with the . . . respiration stuff, can we intubate?

DR. SHARMA: Yes.

**9:29 p.m.** Almonte's "respiratory drive had decreased" and his heart rate declined to 158 beats per minute (bpm). The paramedics suctioned "large amount[s] of fluid" from Almonte's "oral and nasal airways." Cusimano was able to open Almonte's airway enough to insert a device to perform ventilation through a bag-valve-mask.

**9:30 p.m.** Pernell made the second cellular phone call to Dr. Sharma, during which the following exchange occurred:

PERNELL: This kid needs to be intubated. I need to get some orders for Succ and Etomidate.

. . . .

DR. SHARMA: Etomidate . . . would be around four milligrams . . . And Succinylcholine . . . you can give him about [twenty-four] milligrams.

. . . .

DR. SHARMA: Yeah. And I'm going to call [University Hospital] and update them that you're going to intubate this kid.

5

**9:33 p.m.** Pernell intravenously administered a dose of etomidate, a sedative, and a dose of succinylcholine, a muscle relaxant, one minute later.[2]

**9:35 p.m.** Almonte's heart rate was 163 bpm, and his breathing had become "agonal," indicating he was in distress. Cusimano began the first endotracheal intubation attempt: she suctioned Almonte's airway, but "with no success," as there were "copious amounts of fluid in [his] airway" due to Almonte having vomited.[3] Cusimano was "[u]nable to place [the] tube," and the first intubation attempt was deemed "unsuccessful."

**9:37 p.m.** The ambulance arrived at University Hospital. The paramedics remained with Almonte in the ambulance to continue their attempts to intubate him.

**9:38 p.m.** Cusimano began the second intubation attempt. Almonte's "[a]irway [was] completely full of fluid" due to him having vomited, and the second attempt was also deemed "unsuccessful." The paramedics continued to suction and apply bag-valve-mask ventilation.

**9:40 p.m.** Almonte's heart rate fell to 105 bpm and he continued receiving ventilation through the bag-valve-mask.

**9:42 p.m.** Pernell began the third intubation attempt. Almonte's "airway [was] cleared via suction while intubating." The "[p]lacement of [the] tube [was] successful" and was "verified by" measuring

---

[2] Succinylcholine Injection, Cleveland Clinic, https://my.clevelandclinic.org/health/drugs/20755-succinylcholine-injection (last visited June 17, 2026); Etomidate Injection, Cleveland Clinic, https://my.clevelandclinic.org/health/drugs/19868-etomidate-injection (last visited June 17, 2026).

[3] Endotracheal intubation is the process by which "[a] healthcare provider uses a laryngoscope to guide an endotracheal tube into . . . [the] trachea." The tube keeps the patient's airway open so that oxygen can be received into the lungs. Intubation, Cleveland Clinic, https://my.clevelandclinic.org/health/articles/22160-intubation (last visited June 17, 2026).

6

Almonte's breathing and through "[d]irect [v]isualization." At this point, Almonte's heart rate decreased to 71 bpm.

**9:44 p.m.** Almonte's heart rate dropped to 47 bpm and he stopped breathing.

**9:45 p.m.** Almonte's heart rate dropped to 24 bpm and the paramedics began transporting Almonte into the hospital. During the transfer, Almonte was described as having "a weak carotid pulse." The paramedics began compressions.

**9:47 p.m.** Almonte was transferred to the Trauma Center by stretcher. When Almonte arrived, he was in cardiac arrest. The trauma physician found that the endotracheal tube was not in Almonte's trachea. Almonte was then reintubated and resuscitated.

**9:57 p.m.** Almonte's breathing returned.

On September 25, 2012, Almonte was discharged from the hospital and was diagnosed with an anoxic brain injury,[4] along with a number of significant physiological repercussions.

B.

Almonte's parents, Jari Almonte and Yahaira Almanzar (plaintiffs), filed a complaint against Atlantic Ambulance Corporation and multiple entities listed as "John Doe" and "ABC Company,"[5] alleging that their negligent,

---

[4] An "anoxic brain injury is a type of acquired brain injury that occurs when . . . oxygen is cut off completely from the brain." Hypoxic/Anoxic Brain Injury, Brain Inj. Ass'n of Am., https://biausa.org/brain-injury/about-brain-injury/nbiic/hypoxic-anoxic-brain-injury (last visited June 17, 2026).

[5] In their initial complaint, plaintiffs also named the Township of Union, the Township of Union Fire Department, the Township of Union Volunteer

7

careless, reckless, willful, and wanton acts caused Almonte's injuries. Plaintiffs later amended their complaint to name the paramedics (collectively with Atlantic Ambulance Corporation, defendants).[6] In response to the amended complaint, defendants asserted that plaintiffs' claims were barred by "statutory immunities."

Plaintiffs moved to strike defendants' immunity defense, arguing that (1) the actions of the paramedics were not "in accordance with [the EMSA]" and (2) the paramedics are therefore not entitled to immunity under N.J.S.A. 26:2K-14 (the paramedic immunity statute). Defendants moved for summary judgment, maintaining that the paramedic immunity statute shields the paramedics from liability because they rendered ALS services "in accordance with [the EMSA]."

---

Ambulance Squad, and the Union Emergency Medical Unit as defendants. Plaintiffs filed a voluntary dismissal for their complaint against the Township of Union and the Township of Union Fire Department without prejudice. Plaintiffs' complaint against the Township of Union Volunteer Ambulance Squad was dismissed for lack of prosecution.

[6] Plaintiffs' amended complaint also added Dr. Sharma, Dr. Sharma's employer, Overlook Medical Center, and the BLS EMTs as defendants. Pursuant to a stipulation of the parties, Dr. Sharma, the BLS EMTs, and the BLS EMTs' employer, Union Emergency Medical Unit, were dismissed with prejudice. As the Appellate Division noted, Overlook Medical Center "was granted summary judgment in its favor by the trial court." That order was not on appeal before the Appellate Division and is therefore not on appeal before this Court.

8

The trial court granted defendants' motion and dismissed with prejudice plaintiffs' complaint for failure to state a claim upon which relief can be granted. The trial court found that the paramedic immunity statute unambiguously confers immunity where paramedics act "in accordance with [the EMSA]" and that such immunity extends to both paramedics and "the entities they work on behalf of." The court held that the paramedics "at all times followed the orders of Dr. Sharma once they established contact" and that defendants accordingly qualified for immunity. The court additionally concluded that, because the plain language of the paramedic immunity statute is clear, it did not need to consult extrinsic sources to determine the Legislature's intent, such as regulations promulgated by the Commissioner of the State Department of Health (the Commissioner).

Plaintiffs appealed, maintaining that the paramedics failed to provide ALS services "in accordance with [the EMSA]." The Appellate Division affirmed the trial court's conclusion that "at all relevant times, the paramedics were performing [ALS] services consistent with the statute" because the paramedics contacted Dr. Sharma twice and obtained her authorization to intubate Almonte. The appellate court noted that the statute itself does not define "maintain direct voice communication" and credited the testimony of plaintiffs' expert, Dr. Brown, that such communication need not be a

9

"constant, live stream." Thus, the appellate court concluded that plaintiffs' contention -- that a patient's change in circumstances, including the ambulance's arrival at the hospital, mandates that paramedics recontact the medical command physician -- lacks statutory support.

The Appellate Division further reasoned that Dr. Sharma's testimony made "clear" that she did not authorize a specific number of intubation attempts. Therefore, the appellate court held that the paramedics' reliance on Dr. Sharma's authorization and instructions to intubate Almonte was in accord with the EMSA. The Appellate Division also found no basis to resort to the regulations to discern legislative intent because the language of the paramedic immunity statute is "clear."

Plaintiffs filed a petition for certification, raising the same issues they presented to the Appellate Division. We granted certification, limited to the question whether the paramedics should be granted "immunity under N.J.S.A. 26:2K-14," which depends upon whether "they acted 'in accordance with the act.'" 260 N.J. 616 (2025).[7]

_____

[7] We did not grant certification as to plaintiffs' assertion that the actions of the paramedics were not objectively reasonable and therefore were not rendered in "good faith."

10

Plaintiffs submit that the paramedics did not render ALS services to Almonte "in accordance with [the EMSA]" because they failed to "maintain direct voice communication" with Dr. Sharma. Specifically, plaintiffs allege that the paramedics "ignore[d]" Dr. Sharma "for [seventeen] minutes at the height of a crisis." Plaintiffs acknowledge, consistent with the testimony of their expert, Dr. Brown, that "maintain[ing] direct voice communication" does not necessitate that paramedics remain on speakerphone with the physician at all times. Nevertheless, plaintiffs argue, also pursuant to Dr. Brown's testimony, that reestablishing communication is mandatory when a patient's circumstances significantly change. Plaintiffs assert that, because the paramedics did not reinitiate contact with Dr. Sharma, she was never informed of Almonte's declining heart rate or the ambulance's arrival at the hospital during this period of "radio silence."

Consequently, plaintiffs maintain that the paramedics were not "taking orders from a licensed physician" when they elected to delay Almonte's transfer to the emergency room to continue their attempts at intubation. Plaintiffs assert that the paramedics were required to comply with N.J.A.C. 8:41-8.5(b)(1), which provides that a "difficult intubation" "shall not delay the

11

transportation of a patient." According to plaintiffs, paramedics may not "substitute their own judgment" for that of a physician, and the paramedics' decision to delay Almonte's transport into the emergency room to continue their intubation attempts thus required an additional order from Dr. Sharma.

Plaintiffs further contend that the paramedics were obligated to comply with the relevant regulations because they are "part and parcel" of the same legislative scheme governing emergency medical services. Plaintiffs note that the Legislature first authorized the promulgation of regulations to instruct paramedics on how to perform their tasks and then added N.J.S.A. 26:2K-14's requirement that ALS services be rendered "in accordance with this act." Plaintiffs suggest that this addition reflects a legislative intent to increase oversight of paramedics and limit their immunity.

### B.

Defendants assert that the paramedics who provided ALS services to Almonte acted "in accordance with [the EMSA]." First, defendants submit that the paramedics "maintained appropriate communication" with Dr. Sharma during Almonte's transport to the hospital in order to receive appropriate instructions. Defendants observe that plaintiffs cite no statutory authority requiring paramedics to reestablish contact with a physician at certain intervening events or set intervals. Indeed, they argue that imposing such a

12

requirement would be impractical, given the need for paramedics to intervene rapidly and provide care to critically ill patients in high-stakes situations.

Next, defendants maintain that the paramedics were "taking orders from a licensed physician" when they intubated Almonte, as they received authorization from Dr. Sharma to perform the intubation procedure. Defendants note that Dr. Sharma's testimony makes clear that when she granted such authorization, it was not limited to a specific number of intubation attempts.

Finally, defendants argue that the absence of a reference to the regulations in the paramedic immunity statute, contrasted with the explicit references to regulations in other sections of the EMSA, reflects legislative intent that such regulations need not be considered when evaluating paramedic immunity.

III.

A.

We review "the grant of a motion for summary judgment de novo, applying the same standard used by the trial court." Samolyk v. Berthe, 251 N.J. 73, 78 (2022). "[A] trial court's determination of the applicability" of a statutory immunity "is reviewed de novo," Green v. Monmouth Univ., 237 N.J.

13

516, 529 (2019), like all "[q]uestions pertaining to statutory interpretation," State v. Fuqua, 234 N.J. 583, 591 (2018).

When interpreting a statute, our objective "is to determine and effectuate the Legislature's intent." Bosland v. Warnock Dodge, Inc., 197 N.J. 543, 553 (2009). To that end, we begin with the plain language of the statute, giving the enacted words their ordinary and common meaning. Ibid.; DiProspero v. Penn, 183 N.J. 477, 492 (2005). If the statutory language "could lead to more than one plausible interpretation, we may turn to legislative history, including a sponsor's statement, as well as other interpretative aids." State v. Crawley, 187 N.J. 440, 452 (2006). A statute should not be construed literally if such a reading "would lead to an absurd result" contrary to the Legislature's purpose. Ibid.

It is not the role of this Court to "rewrite a plainly-written enactment of the Legislature." DiProspero, 183 N.J. at 492 (quoting O'Connell v. State, 171 N.J. 484, 488 (2002)). Nor can we "write in an additional qualification which the Legislature pointedly omitted in drafting its own enactment." Ibid. (quoting Craster v. Bd. of Comm'rs of Newark, 9 N.J. 225, 230 (1952)). When the Legislature "includes particular language in one section of the statute but omits it in another section of the same Act, it is generally

14

presumed" that the exclusion was deliberate. DYFS v. A.L., 213 N.J. 1, 21 (2013) (quoting INS v. Cardoza-Fonseca, 480 U.S. 421, 432 (1987)).

B.

In 1973, the Legislature enacted N.J.S.A. 26:2K-1 to -6, collectively known as the Emergency Medical Services Act, to grant qualified immunity to persons who provide medical assistance in emergency situations. L. 1973, c. 229, § 5; see also De Tarquino v. City of Jersey City, 352 N.J. Super. 450, 455 (App. Div. 2002).

The earliest form of the EMSA authorized paramedics to perform defibrillation and gastric suction and to administer intravenous saline or glucose solutions, lidocaine, atropine, sodium bicarbonate, and other drugs authorized by the Commissioner, provided the paramedics also maintained direct communication with and were taking orders from a qualified physician or nurse while performing such services. L. 1973, c. 229, § 3. The original EMSA also conferred immunity upon paramedics "who in good faith perform[] any service authorized by this act." Id. at § 5 (emphasis added).

In 1984, the Legislature repealed the 1973 EMSA and replaced it with N.J.S.A. 26:2K-7 to -20.[8] L. 1984, c. 146, § 15. The new enactment was

_____

[8] In 2022, the Legislature amended certain provisions of the EMSA relevant to this case. The events at issue here transpired while the 1984 version of the

15

designed to "broaden" the "situations in which mobile intensive care personnel may act, yet simultaneously regulat[e] their qualifications so as to ensure the quality of the emergency service rendered." Sponsors' Statement to A. 551 5 (1984). For example, though the Legislature expressed that "mobile intensive care paramedics" may not perform "the duties of a health care professional employed by a hospital," they may perform tasks "necessary to assume the orderly transfer of advanced life support care from a mobile intensive care unit to hospital staff upon arrival at an emergency room." A. Corr., Health, & Hum. Servs. Comm. Statement to A. 551 (Mar. 15, 1984).

The statutory definition of "advanced life support" was broadened to encompass

> an advanced level of pre-hospital, inter-hospital, and emergency service care which includes basic life support functions, cardiac monitoring, cardiac defibrillation, telemetered electrocardiography, administration of anti-arrhythmic agents, intravenous therapy, administration of specific medications, drugs and solutions, use of adjunctive ventilation devices, trauma care and other techniques and procedures authorized in writing by the commissioner.
>
> [N.J.S.A. 26:2K-7(a) (1984).]

---

EMSA was in effect, and thus, all references herein are to the statutory language as it existed at that time.

A mobile intensive care paramedic is "a person trained in advanced life support services and certified by the commissioner to render advanced life support services as part of a mobile intensive care unit," which is "a specialized emergency medical service vehicle . . . operated for the provision of advanced life support services under the direction of an authorized hospital." Id. at -7(h) to (i). A mobile intensive care paramedic, like Pernell and Cusimano, may perform ALS services provided they

> maintain direct voice communication with and are taking orders from a licensed physician or physician directed registered professional nurse, both of whom are affiliated with a mobile intensive care hospital which is approved by the commissioner to provide advanced life support services.[9]
>
> [Id. at -10.]

The phrase "maintain direct voice communication" is not defined in the EMSA and appears only in N.J.S.A. 26:2K-10, quoted above. N.J.S.A. 26:2K-11 likewise permits paramedics to perform ALS procedures under certain specified conditions "[i]f the direct voice communications fail."

N.J.S.A. 26:2K-14 preserves the immunity originally granted under the 1973 EMSA and specifically states: "No mobile intensive care paramedic . . .

---

[9] Overlook Medical Center fulfills the requirements of N.J.S.A. 26:2K-10. See Overlook Medical Center, State of New Jersey Department of Health, https://web.doh.nj.gov/apps2/hpr/characteristics.aspx?num=12005 (last visited June 17, 2026).

17

shall be liable for any civil damages as the result of an act or the omission of an act committed while in training for or in the rendering of advanced life support services in good faith and in accordance with this act." Id. at -14.

Under that provision, a paramedic may act "negligently" yet still be immune from civil liability. Frields v. St. Joseph's Hosp. & Med. Ctr., 305 N.J. Super. 244, 248 (App. Div. 1997) ("[N]egligence does not strip [emergency personnel] of their immunity.").

C.

The 1984 EMSA authorized the Commissioner to regulate the practice of paramedicine by establishing standards for the licensure of paramedics, revoking the certifications of paramedics who violate the EMSA, and promulgating any other rules and regulations that the Commissioner deems necessary to effectuate the Act. N.J.S.A. 26:2K-8, -9, -17.

Pursuant to that authority, the Commissioner adopted standing orders, defined as "initial treatment protocols for unstable [pediatric] patients that may be utilized by ALS crewmembers." N.J.A.C. 8:41-8.2(b). These standing orders are effective "prior to contact with the medical command physician." Ibid. However, "once contact is made with the medical command physician," such regulatory orders "cease to be operative." Id. at -8.2(d).

IV.

We concur with the Appellate Division's determination that the paramedics acted "in accordance with [the EMSA]" due to their "communication[s] with" and "orders from" Dr. Sharma while rendering ALS services to Almonte. Accordingly, we hold that defendants are entitled to immunity under N.J.S.A. 26:2K-14, and we affirm the grant of summary judgment in their favor.

A.

We begin our analysis by determining whether the paramedics were performing "advanced life support services," a requirement for immunity under N.J.S.A. 26:2K-14.

The EMSA defines "advanced life support" services as "an advanced level of . . . emergency service care" that includes "intravenous therapy," "telemetered electrocardiography," and the "use of adjunctive ventilation devices." N.J.S.A. 26:2K-7(a) (1984). Here, the paramedics intravenously administered doses of muscle relaxant and sedative medications to Almonte, monitored his heart rate through an electrocardiogram, and utilized endotracheal intubation, an adjunctive ventilation device.[10] Their interventions

---

[10] Endotracheal intubation is an advanced airway adjunct. See Adjuncts for Airway Control and Ventilation, ACLS Certification Ass'n, https:// aclscertification.org/courses/acls-certification/lessons/chapter-7-adjuncts-for-

19

fall squarely within the statutory definition of ALS services, and the parties do not dispute that the paramedics provided such services to Almonte.

We next address whether -- and affirm that -- the paramedics acted "in accordance with [the EMSA]" by (1) "maintain[ing] direct voice communication with" and (2) "taking orders from a licensed physician." See N.J.S.A. 26:2K-10, -14.

B.

Through their two mobile telephone calls to Dr. Sharma -- at 9:17 p.m. and 9:30 p.m. -- the paramedics "maintain[ed] direct voice communication" within the meaning of N.J.S.A. 26:2K-10.

In interpreting a statute, we begin with its plain language. Bosland, 197 N.J. at 553. Because the EMSA does not define the phrase "maintain direct voice communication," we look to the ordinary meaning of those words, informed by authoritative dictionaries. See Wells Reit II-80 Park Plaza, LLC v. Dir., Div. of Tax'n, 414 N.J. Super. 453, 463-64 (App. Div. 2010) ("It is also appropriate to look to dictionary definitions for determining the meaning of words."). Merriam-Webster provides multiple definitions for "maintain," including to "keep in an existing state"; "continue or persevere in"; "preserve

---

advanced-cardiovascular-life-support/topic/adjuncts-for-airway-control-and-ventilation (last visited June 17, 2026).

20

from failure"; or "provide for." Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/maintain (last visited June 17, 2026). Given that there are multiple definitions for "maintain," "maintain[ing] direct voice communication" may be interpreted as maintaining the "existing state" of that which has been communicated or maintaining an open, "continu[ous]" line.

When a statutory term has "more than one plausible interpretation," "we may turn to legislative history, including a sponsor's statement." Crawley, 187 N.J. at 452. Here, the Sponsors' Statement expressly provides that the purpose of the amendments to the EMSA was to "broaden" the "situations" in which paramedics "may act" and to immunize paramedics for rendering such "acts" if they "maintain direct voice communication with a physician." Sponsors' Statement to A. 551 5-6 (1984). The Legislature's clear intent to expand immunity for paramedics warrants a broad interpretation of the phrase "maintain direct voice communication," such that paramedics need not keep an open, continuous line of communication with the physician.

Indeed, no party contends that "maintain[ing] direct voice communication" imposes a requirement to keep a physician on an open phone line throughout the transport. In his deposition, Dr. Brown, plaintiffs' expert, conceded that paramedics are "not required to have the medical command

21

doctor . . . on speakerphone the entire time during the transport" to the hospital. Plaintiffs, nonetheless, assert that the paramedics' "silence" for seventeen minutes while attempting to intubate after their second call to Dr. Sharma was inconsistent with "maintain[ing] direct voice communication," and they further argue that a significant change in a patient's circumstances, such as a patient's decline in heart rate or the ambulance's arrival at the hospital, mandates reestablishing contact with the medical command physician. The Legislature, however, did not specify a cadence for "direct communication" with the physician, nor did it impose criteria for intervening events that require recontact.

Moreover, reading "maintain direct voice communication" to require continuous or predetermined communication with the physician would lead to an "absurd result" that is contrary to the Legislature's intent in expanding immunity in the emergency context. See Crawley, 187 N.J. at 452. It would make little, if any, sense to require paramedics, who respond to emergencies and provide care for critically ill patients under substantial time pressures, to maintain a predetermined frequency of communication with a licensed physician. Such a requirement would undermine the Legislature's intent to enable paramedics to act in high-stakes situations without fear of tort liability. See De Tarquino, 352 N.J. Super. at 456 ("[The EMSA] recognizes that such

22

emergency services," including "airway clearance . . . pose a higher risk of error . . . and therefore that emergency medical personnel should not be inhibited in performing those services by fear of tort liability."). Testimony elicited from depositions during discovery further underscores that continuous or predetermined communication with the physician is not the norm -- nor is it expected -- in an emergency context. Cusimano stated that, "if there's time," it would be sensible to inform the medical command physician of a patient's worsening condition, and Pernell added that, in this instance, additional communications would have taken "time away from actually addressing [Almonte's] airway issue." Dr. Sharma made clear that in her "fourteen years of practicing emergency medicine," she "never received a phone call back to tell [her] the results [of an intubation]."

Further, this Court cannot "write in[to the statute] an additional qualification," such as requiring paramedics to recontact the physician when certain intervening events occur. DiProspero, 183 N.J. at 492 (quoting Craster, 9 N.J. at 230). In fact, when asked at oral argument "what [would be considered] a material change [in] circumstance[s] such that, instead of continuing to follow the direction to intubate the child, [the paramedics] should reestablish communication," plaintiffs indicated that a "precipitous change in heart rate" would qualify as one such circumstance, but they were

23

unable to quantify just how much of a change is necessary to warrant recontacting the physician. Absent specific criteria from the Legislature, the paramedics could not know at which point Almonte's declining heart rate -- first observed at 9:29 p.m., one minute prior to their second call with Dr. Sharma, and at subsequent times as discussed above -- should prompt them to deviate from the prior order to intubate Almonte and to instead reinitiate contact with Dr. Sharma. Indeed, Dr. Sharma confirmed that she has never received a call informing her of a patient's change in circumstances "related to intubation."

As confirmed by Dr. Brown's testimony, paramedics must "balance" the need to contact the medical command physician with the immediate need to treat the patient during an acute crisis. Dr. Brown agreed that "[s]ometimes," "a paramedic might have to make a judgment call between stabilizing a patient and moving them." The discretion paramedics are afforded and the time constraints under which they operate counsel against interpreting "maintain[ing] direct communication" to require paramedics to divert from the crisis at hand and to contact the physician at set intervals or upon specific undesignated, intervening events.

24

Because N.J.S.A. 26:2K-10 does not impose such requirements, we conclude that the paramedics' two mobile telephone calls to Dr. Sharma were sufficient to "maintain direct voice communication" with medical command.

C.

Moreover, the contents of the paramedics' phone calls with Dr. Sharma clearly establish that they were "taking orders from a licensed physician" within the meaning of N.J.S.A. 26:2K-10.

In the first phone call, Pernell relayed Almonte's vital signs and the events leading to his injuries. Pernell suggested administering "Versed or Valium" to manage Almonte's seizures. Dr. Sharma directed the paramedics to give Almonte "one milligram" of Valium. Pursuant to this order, the paramedics intravenously administered a dose of Valium to Almonte at 9:17 p.m. During the same phone call, Pernell asked, "in the event that we have to deal with the . . . respiration stuff, can we intubate?" Dr. Sharma responded, "[y]es."

Per Pernell's deposition testimony, paramedics are obligated to recontact medical command only if they "need[] something additional," such as more medication, "to help [them] with that intubation." The need for such medications prompted Pernell's second phone call to Dr. Sharma at 9:30 p.m., during which he immediately informed Dr. Sharma that Almonte "need[ed] to

25

be intubated" and requested "orders for Succ and Etomidate." Dr. Sharma instructed the paramedics to give Almonte "four milligrams" of etomidate and "[twenty-four] milligrams" of succinylcholine. The paramedics complied by administering etomidate at 9:33 p.m. and succinylcholine at 9:34 p.m. and attempting intubation at 9:35 p.m. Dr. Sharma confirmed this order by stating that she would notify the hospital that the paramedics were going to intubate Almonte.

The ambulance arrived at the hospital at 9:37 p.m. The paramedics attempted intubation at 9:38 p.m. and again at 9:42 p.m. Plaintiffs contend that the paramedics could not "substitute their own judgment" for that of a physician and therefore were required to obtain an order from Dr. Sharma to continue intubating rather than immediately transport Almonte to the emergency room.

Dr. Sharma testified, however, that "when [she] discussed with [the paramedics] . . . [Almonte's] intubation, [she] was not thinking about how many attempts they were going to have." Dr. Sharma's initial authorization to intubate Almonte was thus sufficient to span the seven-minute timeframe during which multiple intubation attempts were made.

The continuing authority of a medical command physician's order is bolstered by Cusimano's confirmation that seeking additional approval for

26

each intubation attempt would "unnecessarily waste[] time." She explained that, upon initiating contact with the physician, "everything [the paramedics] do from that point on is under the direction of medical command," notwithstanding the absence of explicit reauthorization from medical command for each related subsequent act.

Moreover, the Committee Statement accompanying the 1984 amendments to the EMSA clarifies the scope of paramedics' authority. Although paramedics are not "permitted to perform the duties of a health care professional employed by a hospital," they may perform those that are "necessary to assume the orderly transfer of advanced life support care . . . to hospital staff upon arrival at an emergency room." A. Corr., Health, & Hum. Servs. Comm. Statement to A. 551 (Mar. 15, 1984). Here, the paramedics testified that, in exercising their judgment, transporting Almonte to the emergency room staff before establishing an open airway would have been "reckless." Thus, they continued to perform the "necessary" task of intubation.

### D.

Plaintiffs argue that the regulations are an integral part of the legislative scheme governing emergency medical services and inform the scope of the paramedics' immunity under the EMSA. Plaintiffs specifically rely on

27

N.J.A.C. 8:41-8.5(b)(1), which provides that a "difficult intubation" "shall not delay the transportation of a patient," to argue that the paramedics here did not act "in accordance with [the EMSA]."

In considering plaintiffs' argument, we note that the plain language of N.J.S.A. 26:2K-14 does not reference the regulations, whereas other provisions of the EMSA expressly do so. For example, N.J.S.A. 26:2K-9 provides that "[t]he commissioner . . . may revoke the license of a mobile intensive care paramedic for violation of any provision of this act or regulation promulgated hereunder." (emphasis added). And N.J.S.A. 26:2K-12(d) permits "[t]he commissioner [to] withdraw his authorization if the hospital or unit violates any provision of this act or rules or regulations promulgated pursuant thereto." (emphasis added). Thus, we presume the Legislature's exclusion of the term "regulations" in the paramedic immunity statute was deliberate. See A.L., 213 N.J. at 21 ("[Where] [the Legislature] includes particular language in one section of the statute but omits it in another section of the same Act, it is generally presumed that [the Legislature] acts intentionally and purposely in the disparate inclusion or exclusion." (first alteration in original)).

Even if we assume that the regulations are relevant to the paramedics' immunity analysis, the applicable standing orders make clear that they "cease to be operative once contact is made with the medical command physician."

28

N.J.A.C. 8:41-8.2(d). Cusimano confirmed this point during her testimony, stating that once contact is made with the physician, the paramedics' conduct from "that point on is under the direction of medical command." Plaintiffs do not challenge the paramedics' conduct prior to them having established contact with Dr. Sharma at 9:17 p.m., at which point the standing orders no longer governed their conduct. Thereafter, the paramedics acted pursuant to Dr. Sharma's orders.

V.

Our decision in this case is based upon the statutory framework the Legislature has established for emergency medical services. Paramedics are called upon to make rapid decisions in the field, often under intense time pressure. The law grants immunity to paramedics who act "in accordance with [the Emergency Medical Services Act]" to ensure that the professionals who respond to emergencies are empowered to act swiftly and decisively, without the potentially paralyzing fear of civil liability.

Here, the paramedics who rendered advanced life support services to Almonte acted under Dr. Sharma's order to intubate, which she conveyed during two mobile telephone calls with the paramedics. Accordingly, we find that the paramedics "maintain[ed] direct voice communication with" and

29

"t[ook] orders from a licensed physician," such that defendants are entitled to the immunity provided by the EMSA under N.J.S.A. 26:2K-14.

We therefore affirm the judgment of the Appellate Division.

CHIEF JUSTICE RABNER and JUSTICES PATTERSON, PIERRE-LOUIS, WAINER APTER, FASCIALE, and NORIEGA join in JUSTICE HOFFMAN's opinion.